*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0362P (6th Cir.)
File Name: 02a0362p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　　*v.*　　　　　　　　　　　　No. 00-6630

RUDOLPH KESZTHELYI,
　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 99-00100—R. Allan Edgar, Chief District Judge.

Argued: June 12, 2002

Decided and Filed: October 17, 2002

Before: BOGGS, SILER, and MOORE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellant. Paul W. Laymon, Jr., ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellant. Paul W. Laymon, Jr., ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

MOORE, J., delivered the opinion of the court, in which SILER, J., joined. BOGGS, J. (pp. 34-35), delivered a separate concurring opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Rudolph Keszthelyi appeals the district court's denial of his motion to suppress evidence seized during three searches of his house, as well as the sentence imposed by the district court following his plea of guilty to distributing cocaine and engaging in a monetary transaction in criminally derived property. Defendant contends, first, that the warrant authorizing the initial search of his residence was invalid due to material factual omissions in the warrant affidavit. Defendant also argues that his Fourth Amendment rights were violated when law enforcement agents conducted a second search of his home without obtaining a new search warrant. In relation to his sentence, Keszthelyi objects to the district court's determination of drug quantity by extrapolating from unexplained deposits into Keszthelyi's bank accounts over a five-year period, and to the application of a two-level upward adjustment based upon Keszthelyi's possession of firearms in connection with the drug offenses. For the reasons stated below, we **AFFIRM**.

## I.  FACTS AND PROCEDURE

On October 27, 1999, a grand jury in the Eastern District of Tennessee returned a sixteen-count indictment against defendant Keszthelyi. The indictment was followed by three superseding indictments, culminating in the eighty-seven count Third Superseding Indictment filed on March 28, 2000. The Third Superseding Indictment charged Keszthelyi with conspiracy to distribute cocaine hydrochloride, numerous counts of engaging in monetary transactions in criminally derived property, numerous counts of distributing cocaine hydrochloride, possessing firearms in connection with drug

*Alexander v. Louisiana*, 405 U.S. 625, 633-34 (1972) (discussing the tradition of "avoiding decision of constitutional issues unnecessary to the decision of the case before us").

---

## CONCURRENCE

---

BOGGS, Circuit Judge, concurring. I concur in all of the court's opinion, except for Part II.A.2.a (pp. 13-22), concerning the Fourth Amendment validity of the October 9, 1999 search. Whether the October 9 search was a reasonable continuation of the October 8 search is a close and difficult question. The inevitable discovery rule provides a wholly sufficient ground on which to hold the evidence seized in the search admissible. *See* Op., Part II.A.2.b (pp. 22-26).

Since Keszthelyi was incarcerated during the entire period of the search, I see little difference in the privacy violation between a, for example, two-hour search on October 8, and a one-hour search on October 8 and another on October 9. The search on October 9 does not appear to have been either gratuitous, or designed to inflict some additional privacy violation. In addition, there seems to be a contradiction between the easy conclusion on page 22 that "little objective basis existed for believing that evidence escaped the first search" and the correct statement on page 25 that "the amount of cash found during the initial search of the defendant's residence was less than expected" (as well as Agent Isom's informed (and ultimately correct) conclusion that cocaine should have been found at the house). By making this firm a holding in a very close case, we merely insure that, in this circuit, well-informed police officers will make sure that a search continues for whatever length of time is necessary to call in additional resources and information, communicate with superiors, etc., even if it means prolonging an initial search well beyond what would have occurred otherwise.

I would have abstained from deciding the validity of the October 9 search, given the clear applicability of the inevitable discovery rule. We should not decide constitutional questions when their resolution is unnecessary to determine the relevant legal question: in this case, the admissibility of the evidence seized in the October 9 search.

trafficking, possessing firearms as an alien illegally in the United States, and multiple counts of obstructing justice and persuading witnesses to withhold testimony.

On July 5, 2000, Keszthelyi entered into a plea agreement, whereby he pleaded guilty to one count of knowingly engaging in a monetary transaction in criminally derived property in violation of 18 U.S.C. § 1957 (Count Two) and one count of distributing cocaine hydrochloride in violation of 21 U.S.C. § 841 (Count Forty-Two). In exchange, the United States dismissed the remaining counts of the indictment. The plea agreement contained no agreement as to the quantity of drugs involved in Keszthelyi's criminal conduct. Pursuant to the plea agreement, Keszthelyi reserved the right to appeal the district court's denial of his motion to suppress evidence seized during three searches of his residence.

### A.  Background and Investigation

Keszthelyi migrated from South Africa to the United States in October of 1992 on a work visa. Keszthelyi settled in Chattanooga, Tennessee, where he began employment with a company called E&R Products. This company produced various woodwork products, including customized van interiors. In 1994, Keszthelyi purchased E&R Products and obtained a business license, which was in effect from 1994 to 1995. There is no record of E&R Products operating after 1995. Keszthelyi's visa expired in 1995, but he continued to remain in the United States illegally.

In December of 1998, the Chattanooga Police Department ("CPD"), the Drug Enforcement Agency ("DEA"), and the Bureau of Alcohol, Tobacco, and Firearms ("ATF") initiated an undercover investigation to identify individuals selling cocaine in Chattanooga night clubs. Keszthelyi, a suspected cocaine dealer, was the primary target of this investigation. ATF Special Agent Jeff Harwood worked undercover, posing as a successful Nashville businessman named Jeff Harris who was on probation for prior drug arrests. Harwood frequented night clubs in Chattanooga in an effort to befriend targets of

the investigation. Harwood was wired and monitored by a control agent during these activities. Over the course of the investigation, Harwood made a number of controlled purchases of cocaine from the defendant Keszthelyi. Sometime after July 18, 1999, Harwood returned to Nashville and ceased to be involved in the investigation.

On October 8, 1999, law enforcement authorities obtained a warrant to search Keszthelyi's home from a magistrate judge. The warrant instructed the officers to search the home "on or before October 18, 1999 (not to exceed 10 days)." Joint Appendix ("J.A.") at 60. Agent James Isom of the DEA submitted an affidavit in support of the warrant. A substantial portion of the affidavit described a number of controlled purchases of cocaine from the defendant made by a confidential informant identified as CI-4. The affidavit explains that in August of 1999, CI-4 was apprehended leaving Keszthelyi's residence, at which time he informed law enforcement officials that he had just purchased a gram of cocaine from the defendant and had been buying one to two grams per week from Keszthelyi for approximately one year. CI-4 agreed to cooperate with the investigation at that time. In August, September, and October of 1999, CI-4 engaged in six controlled purchases of cocaine from the defendant in quantities ranging from one to five grams. These transactions were electronically monitored and observed by law enforcement agents. Three of these purchases occurred at Keszthelyi's residence. The final purchase at his residence occurred on October 7, 1999, the day before the warrant was issued.

In addition to the information concerning CI-4, Agent Isom's affidavit described two controlled purchases of cocaine made by Agent Harwood while working undercover. The affidavit also noted the statements of three other confidential informants, identified as CI-1, CI-2, and CI-3, describing Keszthelyi's cocaine distribution activities. Finally, the affidavit described the results of an extensive financial investigation of Keszthelyi, which revealed that the defendant had made cash deposits into multiple bank accounts

the factual similarities in the present case, defendant's reliance on *Peters* is unavailing. The *Peters* decision was based upon the high degree of deference afforded to the district court's decision whether to apply the dangerous-weapon enhancement. In *Peters*, the district court made a finding of fact that the gun was not possessed in connection with the drug offense. Although the facts of that case might have permitted the opposite conclusion, we did not believe that the facts were so one-sided that the district court's finding was clear error. *Id.* The *Peters* decision offers little assistance to a defendant when, as was the case here, the district court does apply the enhancement and it is the defendant, as opposed to the government, who appeals. *Hill*, 79 F.3d at 1486 (distinguishing *Peters*).

### III. CONCLUSION

Based upon the foregoing analysis, we **AFFIRM** both the district court's denial of defendant's motion to suppress and the court's determination of the defendant's sentence.

where drugs were found was sufficient to warrant enhancement). In concluding that it was not clearly improbable that the firearms were used in connection with the drug offenses, the district court emphasized that the cocaine was sold at defendant's residence, the weapons were loaded, and the pistol-gripped shotgun was "not of a hunting type nature." J.A. at 412 (Sentencing Tr. at 206). These facts contrast sharply with the example of "an unloaded hunting rifle in the closet," which the commentary to § 2D1.1 offers as a situation in which it would be clearly improbable that the firearm was used in connection with the offense. U.S.S.G. § 2D1.1, commentary, applic. note 3. Based upon these facts, the district court did not clearly err in applying the enhancement.[4]

The defendant relies on our opnion in *United States v. Peters*, 15 F.3d 540 (6th Cir.), *cert. denied*, 513 U.S. 883 (1994), for his argument that the district court erred in applying the § 2D1.1(b)(1) enhancement. In *Peters*, we affirmed the district court's decision not to apply a § 2D1.1(b)(1) enhancement where a handgun was found in a dresser that also contained crack cocaine. *Id.* at 546. Despite

---

[4]The defendant also argues that application of a § 2D1.1(b)(1) enhancement is inconsistent with the Supreme Court's opinion in *Bailey v. United States*, 516 U.S. 137, 143 (1995). The defendant's argument is without merit. *Bailey* held that a defendant could not be convicted of "using" a firearm during a drug offense under 18 U.S.C. § 924(c)(1) without "evidence sufficient to show an *active employment* of the firearm by the defendant." *Id.* At the time of the *Bailey* decision, 18 U.S.C. § 924(c)(1) did not proscribe mere possession of a firearm in connection with a drug offense (although Congress subsequently amended § 924(c) in 1998 to include mere possession). Thus, *Bailey* interpreted statutory language that was significantly different than the language of U.S.S.G. § 2D1.1, which authorizes a sentencing enhancement if a dangerous weapon was "possessed." Section 2D1.1 does not require a showing that the defendant "used" a firearm. Consequently, *Bailey* is not controlling in the instant case. *See United States v. Blankenship*, 954 F.2d 1224, 1227 (6th Cir.), *cert. denied*, 506 U.S. 901 (1992) ("This court has decided that there is a distinction between possession of firearms required for enhancement under the Guidelines and 'using and carrying' required for a violation of section 924(c)(1) . . . .").

totaling $240,034 over five years and had made a number of very expensive purchases despite having no appreciable legitimate income.

Law enforcement agents arrested Keszthelyi at approximately 3:00 p.m. on October 8, 1999. On that day, agents waited for Keszthelyi to leave his residence and arrested him in his vehicle as he was driving away from his home. Agents searched the vehicle at that time and found four grams of cocaine hidden inside the defendant's garage door opener. Shortly after arresting the defendant, agents commenced a search of Keszthelyi's home pursuant to the search warrant obtained earlier that day. Agents found a loaded semi-automatic pistol inside a night table in Keszthelyi's bedroom and a loaded pistol-gripped shotgun in the bedroom closet. Agents discovered approximately $1000 cash in the pocket of a jacket hanging in the bedroom closet. Agents also found a digital scale, electronic surveillance equipment set up to monitor the exterior of the house, business records, several boxes of ammunition, a digital pager, numerous bottles of pills, a box of syringes, and various other items. No cocaine was found on the premises. The agents concluded their search and left the property at approximately 5:00 p.m.

On October 9, Agent Isom, who had not participated in the initial search of Keszthelyi's residence, telephoned the U.S. Attorney's office about returning to the residence to continue the search. Isom stated that he "felt very strongly that there was something there that had not been located" during the initial search. J.A. at 309 (Suppression Hrg. at 22). The decision was made to re-enter the residence and continue the search without obtaining a new search warrant. During the second search of defendant's residence, Isom noticed that the oven in defendant's kitchen was moveable. He moved the oven and discovered a plastic bottle containing approximately one ounce of cocaine.

After Keszthelyi's arrest, law enforcement agents interviewed a number of additional witnesses, including three

confidential informants identified as W-1, W-2, and W-3. Witnesses W-1, W-2, and W-3 were known to the police before October 8, 1999, but the investigation team waited to interview them until after Keszthelyi was in custody in order to ensure that Keszthelyi would not influence them. These witnesses informed the agents that they had purchased cocaine from Keszthelyi, and stated that Keszthelyi had buried money on his property.

On October 11, Agent Isom obtained a new warrant to search defendant's property once again. The affidavit in support of the new warrant summarized the information contained in the first affidavit, and added information concerning the cocaine and other evidence seized from the defendant's car and home on October 8 and 9, as well as the information obtained from W-1, W-2, and W-3. Pursuant to the warrant, agents searched Keszthelyi's home again on October 11, 1999, but no money or drugs were found.

## B. Suppression Proceedings

In the district court, Keszthelyi moved to suppress all evidence seized as a result of the three searches of his home. Keszthelyi argued that the affidavit in support of the first warrant was insufficient to demonstrate probable cause, and that the affidavit contained material omissions concerning allegations of misconduct on the part of Agent Harwood. Keszthelyi further objected that the search of October 9, 1999, could not be permitted under the auspices of the initial warrant, and that the search of October 11, 1999, was not supported by new probable cause.

A suppression hearing was held on March 20, 2000. Defense counsel called Agent Harwood and questioned him about allegations that Harwood became involved in a sexual relationship with Kim Brogdon, a target of the investigation and ex-girlfriend of the defendant, during his participation in the undercover investigation. Harwood testified that he was not sexually involved with Brogdon during the investigation, but that he did begin a sexual relationship with her after his involvement in the investigation ended. Harwood stated that

## 2. Firearms Enhancement

Keszthelyi next objects to the district court's application of a two-level enhancement to his sentence under U.S.S.G. § 2D1.1(b)(1), which provides for such an enhancement "[i]f a dangerous weapon (including a firearm) was possessed" in connection with a drug offense. The commentary to this guideline instructs that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, commentary, applic. note 3. The government bears the initial burden of showing that the defendant possessed a firearm during the crime. *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994). Constructive possession of a firearm is sufficient and may be established by defendant's "ownership, dominion, or control over the item itself, or dominion over the premises where the item is located." *United States v. Snyder*, 913 F.2d 300, 304 (6th Cir. 1990) (quotation omitted), *cert. denied*, 498 U.S. 1039 (1991). Once possession is established, "the burden shift[s] to the defendant to show that it was clearly improbable that the weapon was connected with the offense." *Cochran*, 14 F.3d at 1132 (quotation omitted). We review for clear error the district court's determination of whether the defendant possessed a weapon in connection with the drug offense. *United States v. Hill*, 79 F.3d 1477, 1486 (6th Cir.), *cert. denied*, 519 U.S. 858 (1996).

The district court's application of the § 2D1.1(b)(1) enhancement was not clearly erroneous. Both firearms were found in defendant's bedroom, and the shotgun was located in the same closet as the seized cash. Drugs were also found in the residence, and evidence established that the defendant sold cocaine in his residence as recently as the day before the search. This court has upheld § 2D1.1(b)(1) enhancements in similar factual circumstances. *See, e.g.*, *Hill*, 79 F.3d at 1486 (upholding enhancement where drugs were found in "residence to which [defendant] had full access and where drugs were found"); *Snyder*, 913 F.2d at 303-04 (holding that discovery of gun in defendant's night stand in residence

cash deposits and those checks specifically identified by Stout as drug payments in arriving at its quantity estimate, thus omitting nearly $100,000 in deposits that could not be attributed to legitimate income. In addition, testimony introduced at sentencing suggested that the defendant possessed substantial cash reserves that were not identified by law enforcement authorities. For example, Agent Barker testified that Keszthelyi once purchased an automobile with a $9500 cash payment; but Barker found no record of any withdrawal from the defendant's bank accounts that could have supported such a payment. By using only cash deposited into defendant's bank accounts and not making an effort to estimate cash income that was spent before it was deposited, the district court likely underestimated defendant's cash income.

Second, the government presented sufficient evidence at the sentencing hearing to establish the conversion ratio — *i.e.*, the price per unit of drugs — used by the district court. *See Samour*, 9 F.3d at 537-38 (finding district court committed clear error in determining price of a pound of marijuana for use in conversion); *Jackson*, 990 F.2d at 253. Several of defendant's former customers testified that defendant's regular practice was to sell cocaine in gram quantities at a price of approximately $100 per gram. Indeed, Stout testified that he tried on a number of occasions to convince Keszthelyi to sell him cocaine in larger quantities, but Keszthelyi refused. This evidence, we think, was sufficient to support the district court's finding that defendant received approximately $100 for each gram of cocaine sold.

In sum, we determine that the district court did not clearly err in estimating the quantity of cocaine for which defendant was responsible. In our opinion, the evidence was sufficient, under a preponderance standard, to find both that defendant received at least $245,000 as a result of cocaine sales and that these proceeds were generated by sales of cocaine at a constant price of approximately $100 per gram.

Brogdon spent the night at his undercover apartment several times, but Harwood denied having sexual intercourse with her on any of those occasions.[1]

Defense counsel also asked Harwood whether he had ever used drugs while working undercover. In particular, defense counsel cited suspicious circumstances surrounding a drug purchase made by Harwood on February 13, 1999, at the South Beach Nightclub. Evidence surrounding that transaction showed that Harwood paid $300 for a quantity of cocaine. Although $300 would have been the normal price for one-eighth of an ounce of cocaine, Harwood only turned over one-sixteenth of an ounce to his control agents. Law enforcement records also showed that the cocaine was not turned over to the DEA until several days after it was purchased. Harwood testified that he did not use any of the cocaine, and that it would have been his normal practice immediately to turn the drugs over to his control agent.

According to Harwood, an internal affairs investigation concerning charges of his drug use and improper relationship with Brogdon was launched in January 2000. Harwood denied any wrongdoing and was unaware of the current status of the investigation.

Agent Isom also testified at the suppression hearing. Isom testified at length about the information gathered in support of the warrant affidavit, including the investigation surrounding the confidential informant identified as CI-4 and the alleged improprieties of Agent Harwood. Isom stated that he personally observed the controlled purchases made by CI-4. Isom also stated that Agent Harwood had no connection to any activities involving CI-4. Isom testified that he did not know whether Brogdon and Harwood became involved romantically before Harwood's undercover assignment ended.

---

[1] Brogdon was called to testify at the suppression hearing, but she exercised her Fifth Amendment privilege and refused to answer any questions about her involvement with Harwood.

The district court denied Keszthelyi's motion to suppress. The court concluded that Agent Isom's affidavit was sufficient to provide probable cause to support the issuance of the October 8 warrant. The court found that Keszthelyi had not shown by a preponderance of the evidence that Agent Harwood had engaged in any misconduct during the investigation. The court also concluded that even if the affidavit contained material omissions about the conduct and credibility of Agent Harwood, the unaffected portions of the affidavit, particularly those involving the controlled purchases by CI-4, would have been sufficient to demonstrate probable cause. The court further concluded that the October 9 search was a valid continuation of the October 8 search and did not require the issuance of a separate warrant. Finally, the court found that the October 11 search warrant was supported by new probable cause arising after the first two searches, and was therefore valid.

## C.  Sentencing

A sentencing hearing was held on November 6, 2000. At the hearing, the government attempted to prove the quantity of drugs sold by the defendant by extrapolating from unexplained cash deposits made into Keszthelyi's various bank accounts between 1994 and 1999. IRS Agent Lynn Barker testified concerning the results of a detailed investigation of Keszthelyi's finances. Barker testified that net deposits in Keszthelyi's bank accounts between 1994 and 1999 totaled approximately $374,000. Of these, $232,000 were cash deposits and an additional $13,430 could be attributed to checks written to the defendant by Herman Stout, who identified the checks as payments for cocaine. Barker conceded that Keszthelyi earned some legitimate income during the relevant time period. The total deposits that could be traced to legitimate income, however, amounted to no more than $35,000. The government also introduced evidence tending to show that Keszthelyi very rarely worked, and spent the vast majority of his time at a local health club where he would receive and make calls concerning cocaine transactions. The government also offered testimony to show

legitimate income to explain the cash deposits. *Accord United States v. Fitzgerald*, 89 F.3d 218, 223-24 (5th Cir.) (defendant's possession of large amount of cash at time of arrest combined with fact that defendant was unemployed sufficient to demonstrate that cash was proceeds of drug sales), *cert. denied*, 519 U.S. 987 (1996). Keszthelyi's primary explanation for the large amount of cash deposited into his accounts was that he received the cash from friends and relatives in South Africa. The district court was entitled to disregard this claim, given Agent Barker's testimony that Keszthelyi's deposits were not consistent with his claims about the amounts that were sent to him and testimony that Chapman admitted to lying about sending money to Keszthelyi. Moreover, the government presented sufficient evidence, in the form of testimony from defendant's customers who stated that they purchased cocaine from the defendant on a regular basis for a number of years, to show that the defendant was continuously and regularly engaged in cocaine distribution throughout the relevant time period. *See United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir.) (finding district court's drug estimate, which assumed sales of a consistent amount of drugs every week for period of two years, was clear error where inadequate evidence existed to show that defendants were continuously engaged in sales at that level throughout the relevant time period), *cert. denied*, 498 U.S. 906, 989, 990 (1990). Thus, the evidence presented by the government both affirmatively excluded innocent explanations for the cash deposits and showed a constant source of revenue from drug sales that explained these deposits. We conclude that the district court did not clearly err in determining that this evidence was sufficient to establish by a preponderance of the evidence that the cash deposited into defendant's bank accounts represented the proceeds of drug sales.

In addition, we think that the district court did choose to err on the side of caution in arriving at its estimate. Based upon Agent Barker's testimony, Keszthelyi made net deposits of more than $339,000, which could not be attributed to legitimate income. Nevertheless, the district court used only

We previously have held that when "the exact amount of drugs involved is uncertain, the court may make an estimate supported by competent evidence"; but the evidence supporting the estimate "must have a minimal level of reliability beyond mere allegation, and the court should err on the side of caution in making its estimate." *Id.* (quotation omitted). The commentary to § 2D1.1 of the Sentencing Guidelines provides some guidance for estimating drug quantity:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.1, commentary, applic. note 12. Applying these principles, we previously have "approve[d] the conversion of seized funds into an equivalent amount of drugs." *United States v. Samour*, 9 F.3d 531, 537 (6th Cir. 1993), *overruled on other grounds by United States v. Reed*, 77 F.3d 139 (6th Cir. 1996); *see also United States v. Jackson*, 990 F.2d 251, 253 (6th Cir. 1993). In order to prove drug quantity by such a method, the government must prove by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio — *i.e.*, the price per unit of drugs. *Jackson*, 990 F.2d at 253.

We conclude that the district court's determination of drug quantity was not clear error. First, we think the government's evidence was sufficient to support a finding that the total amount of unexplained cash deposits made into defendant's accounts over the relevant time period was attributable to drug sales. The government presented a thorough analysis of Keszthelyi's financial records and other testimonial evidence, which convincingly showed that Keszthelyi worked very little during the relevant time period and did not have sufficient

that Keszthelyi only sold cocaine in single gram quantities at a price of approximately $100 per gram. Combining defendant's cash deposits and those checks identified as payments for cocaine, the government contended that at least $245,000 of the deposits made into defendant's bank accounts represented the proceeds of cocaine sales. Assuming that defendant sold cocaine at a constant price of $100 per gram, therefore, the government argued that Keszthelyi was responsible for 2.45 kilograms of cocaine.

The government also offered some direct evidence of defendant's cocaine transactions. Thomas Steffner testified that he purchased cocaine from Keszthelyi between 150 and 200 times. Steffner stated that he typically purchased one-sixteenth of an ounce and occasionally purchased one-eighth of an ounce (approximately 3.3 grams) during these transactions. Dr. David Lewis testified that he purchased cocaine from the defendant between 15 and 20 times, and that he usually purchased one gram at a time. Roger Moss testified that he purchased cocaine from defendant at least 100 times in quantities slightly larger than one gram. Stout testified that he bought cocaine from the defendant as often as several times a week for a period of a year, and that he generally purchased cocaine in quantities of approximately one-and-a-half grams at a time.

Keszthelyi disputed the government's extrapolation theory. He called a number of witnesses who testified that Keszthelyi regularly received parcels containing American currency from his father and a friend in South Africa. At a deposition, Keszthelyi's father testified that he sent his son between $70,000 and $84,000 over seven years. A friend of defendant's, Les Chapman, stated that he had mailed Keszthelyi $40,000, mailed in $5000 monthly increments, during 1995. Keszthelyi also attempted to show that Agent Barker had underestimated his income from E&R Products.

The government presented evidence to rebut Keszthelyi's claims that he received money from friends and family in South Africa. Agent Barker testified that defendant's bank

records did not show deposits consistent with the amounts he claimed were sent to him. Barker also testified that agents did not find any magazines or letters from South Africa during the search of Keszthelyi's home, despite the defendant's claim that Chapman sent him money hidden in between the pages of magazines from home. Theo Hollamby, a police officer from South Africa, also testified that Chapman had admitted to lying about sending money to Keszthelyi during an interview with the South African police.

The district court adopted the government's extrapolation theory, and concluded that the $245,000 in unexplained deposits demonstrated that Keszthelyi had distributed at least 2.45 kilograms of cocaine. Based upon this type and quantity of drugs, the court determined Keszthelyi's base offense level to be twenty-eight. The court applied a two-level enhancement for defendant's possession of firearms in connection with the cocaine offenses. *See* UNITED STATES SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 2D1.1(b)(1) (1998). The district court applied another two-level enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. Finally, the district court granted a two-level downward adjustment for defendant's acceptance of responsibility in accordance with terms of the plea agreement. Consequently, the court determined the defendant's total offense level to be thirty, and the applicable sentencing range to be between 97 to 121 months' imprisonment. The court sentenced Keszthelyi to 120 months' imprisonment and three years of supervised release. Keszthelyi filed a timely notice of appeal.

## II.  ANALYSIS

### A.  Fourth Amendment Objections

#### 1.  Search on October 8, 1999

Keszthelyi's first assignment of error alleges that Agent Isom's affidavit was insufficient to establish probable cause for the search warrant issued on October 8, 1999. The defendant alleges that Agent Isom omitted material facts

involved in narcotics activity. Combined with the statements of W-1, W-2, and W-3, which provided a plausible explanation for the agents' failure to locate more evidence during their initial searches, this information was sufficient to establish probable cause to believe that evidence remained on the defendant's property.

In sum, we think the evidence clearly supports the district court's conclusion that a new warrant to search the defendant's residence inevitably would have been obtained, and that the cocaine behind defendant's oven inevitably would have been discovered, even in the absence of the illegal search on October 9, 1999. We therefore affirm the district court's denial of defendant's motion to suppress the cocaine seized during the October 9 search of his home.

### B.  Sentencing Objections

#### 1.  Drug Quantity

Keszthelyi objects to the district court's findings concerning the quantity of cocaine used to determine relevant conduct. Keszthelyi specifically objects to the district court's extrapolation of drug quantity from the total amount of cash deposits made into his bank accounts between 1994 and 1999.[3] We review the district court's factual findings of drug quantity for clear error. *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000). "A sentencing court may hold a defendant accountable for a specific amount of drugs only if the defendant is more likely than not responsible for a quantity greater than or equal to that amount." *Id.*

---

[3]The defendant argues, relying on *McMillan v. Pennsylvania*, that a clear and convincing evidence standard should apply to the district court's quantity determination, because this finding was "a tail which wags the dog of the substantive offense." 477 U.S. 79, 88 (1986). We rejected an identical argument in *Graham*, 275 F.3d at 517 n.19. In *Graham*, we explained that "[a]s long as a sentencing factor does not alter the statutory range of penalties faced by the defendant for the crime of which he was convicted, *McMillan* permits the factor to be found by preponderance of the evidence." *Id.*

trailer for the purpose of searching it for marijuana. Agents were dispatched to obtain a warrant while others remained at the trailer. The defendant, after being informed that the officers were obtaining a warrant, gave his consent to search the trailer. Pursuant to that consent, the agents at the scene conducted a limited search that uncovered no evidence. The other group of agents returned with a warrant, and conducted another search. The second search was more thorough than the first and did uncover substantial evidence of drug activity. On appellate review, we considered whether the agents' reliance on the search warrant after the fruitless consent search was in good faith. We explained that "where an initial fruitless consent search dissipates the probable cause that justified a warrant, new indicia of probable cause must exist to repeat a search of the same premises pursuant to the warrant." *Id.* at 932. Our chief concern was that the warrant might have been rendered invalid by the fact that it was obtained without informing the magistrate that a fruitless search had already been concluded. We therefore inquired whether the warrant would have issued if information about the initial fruitless search had been provided to the issuing magistrate. *Id.* at 933. Finding that the initial fruitless search would not have dispelled probable cause, due to the cursory and incomplete nature of that search, we declined to suppress the fruits of the second search. *Id.* at 934.

Our decision *in D. Bowling* does not compel invalidation of the October 11 search. In the instant case, the agents did possess new indicia of probable cause not known prior to issuance of the October 8 warrant to support the October 11 search. Most importantly, the police obtained the statements of W-1, W-2, and W-3, which gave the police reason to believe that new evidence could be found buried on the property in a place not previously searched. *Accord id.* at 934 (noting that first search did not dispel probable cause because it did not encompass areas in which police found evidence during second search). In addition, unlike the case in *D. Bowling*, the search of the defendant's vehicle at the time of his arrest and the search of his property on October 8 confirmed the police's suspicions that Keszthelyi himself was

concerning Agent Harwood's misconduct from the affidavit in violation of *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). After an evidentiary hearing, the district court found the claim to be without merit. On appellate review of the district court's ruling on a *Franks* challenge, we review de novo the district court's legal conclusions, and we review the district court's findings of fact for clear error. *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1625 (2002).

In *Franks*, the Supreme Court held that a search warrant "must be voided" if, after a hearing, the defendant establishes by a preponderance of the evidence (1) that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 155-56. We have held that *Franks* challenges may be based on the *omission* of material facts from the warrant affidavit that would, if known to the issuing magistrate, dispel probable cause. *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). We have cautioned, however, that "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information[,] . . . because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (quotation omitted). After reviewing the record, we conclude that Keszthelyi's *Franks* challenge is without merit.

Assuming that Keszthelyi could show that Agent Isom intentionally or recklessly omitted facts relating to Agent Harwood's misconduct, the unaffected portions of the affidavit were more than sufficient to establish probable cause. *See Graham*, 275 F.3d at 506. As the Supreme Court has explained, the standard for probable cause is "whether, given all the circumstances set forth in the affidavit before

[the magistrate], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). At most, inclusion of information about Agent Harwood's alleged misconduct would have undermined the reliability of the information generated by Harwood himself. Thus, the magistrate may have disbelieved the information provided in paragraphs 7, 8, 9, 11, and 12 of the affidavit, which relate to two controlled purchases by Agent Harwood and Harwood's account of various statements made by others implicating Keszthelyi in cocaine trafficking. Harwood's misconduct would not discredit information relating to the six controlled purchases made by CI-4, three of which occurred at Keszthelyi's residence. The uncontradicted evidence at the suppression hearing established that Harwood played no role in the development of CI-4. The controlled purchases by CI-4 were electronically monitored and recorded by the police. Such evidence offers strong support for a finding of probable cause. *See United States v. Harris*, 255 F.3d 288, 293 (6th Cir.) (noting that two controlled purchases by confidential informant with history of reliability played key role in establishing probable cause), *cert. denied*, 122 S. Ct. 378 (2001); *United States v. Murphy*, 241 F.3d 447, 458 (6th Cir.) (finding probable cause to search defendant's hotel room where police observed controlled purchase of crack cocaine made by confidential informant outside hotel room, observed defendant return to hotel room after the transaction, and overheard telephone conversation between informant and defendant arranging the purchase), *cert. denied*, 532 U.S. 1044 (2001). The magistrate judge's probable cause determination was further supported by the statements of CI-1, CI-2, and CI-3, as well as the independent investigation of Keszthelyi's finances. Taken together, this untainted information was sufficient to establish probable cause to believe that contraband would be found in Keszthelyi's home. We therefore affirm the district court's decision denying Keszthelyi's motion to suppress the fruits of the search on October 8, 1999.

whether the cocaine inevitably would have been discovered during the later lawful search.

Moreover, we reject defendant's argument that the October 11 search was a product of the October 9 search. We acknowledge that the affidavit supplied by Agent Isom for the October 11 search warrant included information about the cocaine discovered on October 9. We agree, however, with the district court's conclusion that the untainted portions of the affidavit were sufficient to motivate the October 11 search and would have been sufficient to convince a neutral magistrate of the existence of probable cause. *Id.* at 540 n.2 ("To say that a district court must be satisfied that a [later] warrant would have been sought without the illegal entry is not to give dispositive effect to police officers' assurances on the point. Where the facts render those assurances implausible, the independent source doctrine will not apply."). The decision to search the defendant's home a third time on October 11, 1999, was based largely upon the statements of W-1, W-2, and W-3, who indicated that the defendant buried cash on his property. This information, combined with the fact that the amount of cash found during the initial search of defendant's residence was less than expected, strongly suggested that additional evidence remained on the defendant's property, notwithstanding the fact that a search had already been conducted of defendant's house. The testimony at the suppression hearing shows that the police had planned, before any of the prior searches, to interview these witnesses as soon as the defendant was taken into custody. The affidavit in support of the October 11 search also included new information relating to the evidence seized during the arrest of the defendant and the valid search of his residence on October 8.

Keszthelyi also argues, relying on our decision in *D. Bowling*, 900 F.2d 926, that the October 11 search warrant was invalid because agents lacked new indicia of probable cause necessary to support the issuance of a second warrant to conduct an additional search of his residence. In *D. Bowling*, law enforcement agents went to the defendant's

In *Murray v. United States*, 487 U.S. 533 (1988), the Supreme Court approved the use of the inevitable discovery doctrine under circumstances similar to those presented in the instant case. In *Murray*, federal law enforcement agents observed a suspect drive a truck loaded with marijuana out of a warehouse. *Id.* at 535. The agents illegally forced their way into the warehouse and observed bales of marijuana in plain sight. The agents later obtained a warrant to search the warehouse and legally seized the marijuana. In applying for the warrant, the agents did not mention any facts relating to their prior entry. *Id.* at 535-36. The Supreme Court held that the marijuana should not be suppressed. Although knowledge of the marijuana "was assuredly acquired at the time of the unlawful entry," the Court reasoned, "it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply." *Id.* at 541. Thus, *Murray* teaches that the inevitable discovery exception to the exclusionary rule applies when, as in the instant case, evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first.

We agree with the district court that the government has carried its burden of showing that the cocaine seized during the October 9 search would have been discovered by the lawful search conducted on October 11, 1999. The October 11 search was conducted pursuant to a new warrant and supported by probable cause. During this search, agents once again searched the residence for additional evidence of narcotics. Agent Isom participated in the October 11 search. Given the fact that Isom readily located the cocaine behind defendant's stove during the October 9 search, there is every reason to believe that he would have done the same during the October 11 search had the October 9 search not occurred. The fact that the lawful October 11 search covered the same area, and involved many of the same agents, as the illegal October 9 search minimizes our need to speculate about

## 2. Search on October 9, 1999

Keszthelyi next challenges the constitutionality of the second entry into and search of his home on October 9, 1999. Keszthelyi argues that once the police terminated their search on October 8, any return to the premises constituted a new search and required officers to obtain a new warrant. The government contends that the second search was a reasonable continuation of the October 8 search, and therefore was authorized by the October 8 warrant. In the alternative, the government contends that even if the October 9 search was invalid, the evidence discovered during that search should not be suppressed because it would have been discovered inevitably during the third search of defendant's residence on October 11, 1999. We agree with the defendant that the October 9 search was not a reasonable continuation of the October 8 search. We nevertheless agree with the government that the cocaine inevitably would have been discovered during the October 11 search and should not be suppressed.

### a. The Reasonable Continuation Rule

Most of the federal courts of appeals to have considered the question, including the Sixth Circuit, have held that a single search warrant may authorize more than one entry into the premises identified in the warrant, as long as the second entry is a reasonable continuation of the original search. *United States v. Bowling*, 351 F.2d 236, 241 (6th Cir. 1965), *cert. denied*, 383 U.S. 908 (1966); *United States v. Squillacote*, 221 F.3d 542, 557 (4th Cir. 2000); *United States v. Gerber*, 994 F.2d 1556, 1559 (11th Cir. 1993); *United States v. Kaplan*, 895 F.2d 618, 623 (9th Cir. 1990); *United States v. Carter*, 854 F.2d 1102, 1107 (8th Cir. 1988). In *Bowling*, the police executed a warrant to search the defendant's home for stolen business machines. During the search, the police identified a large number of machines they suspected to have been stolen in the defendant's basement. The police recorded the serial numbers of the machines, left the house without seizing the items, and checked the serial numbers overnight. Upon

discovering that the serial numbers matched those of the stolen goods, the police returned the next day and seized the machines. *Bowling*, 351 F.2d at 240-41. We held that the second entry into the defendant's home was authorized by the original warrant, observing that "the mere fact that the time of its first use was promptly noted [on the warrant] did not vitiate its powers as of the following morning." *Id.* at 241. Thus, *Bowling* establishes that police may sometimes make more than one entry into a residence during the execution of a single warrant without violating the Fourth Amendment.

Our decision in *Bowling*, however, does not permit the police unlimited access to the premises identified in a warrant throughout the life of the warrant. Courts have long recognized the dangers of official abuse that inhere in such a rule. As one state supreme court in our circuit explained nearly fifty years ago:

> If for no other reason than that the officer still has it in his possession, a search warrant once served, but not returned, can be used a second time within [the life of the warrant] for the purpose of a second search of the premises described, then, logically, it would seem to follow that such officer, with his squad of assistants, may use it to make an indefinite number of such searches during that [time period]. Thus, the warrant could become a means of tyrannical oppression in the hands of an unscrupulous officer to the disturbance or destruction of the peaceful enjoyment of the home or workshop of him or her against whom the efforts of such officer are directed.

*McDonald v. State*, 259 S.W.2d 524, 524-25 (Tenn. 1953). Our decision in *Bowling* did not reject the general rule that a warrant authorizes only one search. *See United States v. Gagnon*, 635 F.2d 766, 769 (10th Cir. 1980) ("We agree that once a search warrant has been fully executed and the fruits of the search secured, the authority under the warrant expires and further governmental intrusion must cease."), *cert. denied*, 451 U.S. 1018 (1981); WAYNE R. LAFAVE, 2 SEARCH

### b. Inevitable Discovery

Nevertheless, we conclude that the district court properly denied defendant's motion to suppress the fruits of the October 9 search on the ground that the cocaine seized during that search inevitably would have been discovered during the lawful execution of a second search warrant on October 11, 1999. In *Nix v. Williams*, 467 U.S. 431 (1984), the Supreme Court recognized an exception to the exclusionary rule for evidence seized in violation of the Fourth Amendment that inevitably would have been discovered by lawful means. *Nix* held that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444 (holding that murder victim's body discovered pursuant to illegal search should not be excluded where evidence showed that volunteer search party would have discovered the body in the absence of police misconduct). This circuit has held that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995), *cert. denied*, 517 U.S. 1119 (1996). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000). Although some speculation about how events would have unfolded in the absence of the illegal search is necessary under this doctrine, "we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." *Id.* (quotation omitted). Inevitable discovery raises a mixed question of law and fact and is reviewed de novo. *Id.*

determination of necessity. . . . [T]hose searches deemed necessary should be as limited as possible."). Upon re-entering the defendant's home on October 9, 1999, the agents conducted another complete search of the property. Agent Isom testified that more than five agents participated in the second search, which by all accounts was just as thorough as the first. In this respect, the instant case is distinguishable from those cases which have upheld limited continuation searches carried out for narrowly defined purposes, such as to recover a specific piece of evidence inadvertently left behind during the initial search. *See Kaplan*, 895 F.2d at 623 (concluding that police acted reasonably in returning to office approximately two hours after initial search to obtain certain files identified in the warrant that were not given to them during initial search); *Carter*, 854 F.2d at 1107 (concluding that police acted reasonably in returning to hotel room several hours after initial search to recover $4000 in cash inadvertently left behind during initial search). Similarly, the instant case contrasts sharply with cases such as *Bowling* and *Gerber*, in which the police arguably were able to ameliorate the impairment of a suspect's Fourth Amendment interests by conducting two entries rather than one.

Based upon the foregoing considerations, we conclude that the second search of the defendant's residence was unreasonable. The government's interest in conducting a second search was minimal, since the agents were able to execute fully the warrant during their initial entry and little objective basis existed for believing that evidence escaped the first search. In contrast, the second search of defendant's residence significantly intruded upon Keszthelyi's protected property and privacy interests. Absent some reasonable justification or showing of necessity, we do not think that law enforcement agents may, under the authority of a single warrant, conduct a thorough search of a private residence on one day, and then return the next day to begin the whole process again.

& SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.10(d) (3d Ed. 1996) ("[A] warrant may be executed only once, and thus where police unsuccessfully searched [the] premises for a gun and departed but then returned an hour later and searched further because in the interim an informant told the police of the precise location of the gun, the second search could not be justified as an additional search under the authority of the warrant."). *Bowling* merely recognized that, under certain circumstances, police may temporarily suspend the initial execution of a search warrant and continue the search at another time.

Two aspects of the reasonable continuation rule must therefore be observed. First, the subsequent entry must indeed be a continuation of the original search, and not a new and separate search. Thus, other courts that have followed *Bowling* have appropriately cast the legal question as whether subsequent entries ostensibly carried out under a single warrant are properly characterized as reasonable continuations of the original search or as separate searches requiring separate warrants. *Gerber*, 994 F.2d at 1559 ("We view the opening of the hood on the following Monday as the *continuation* of the search for which the agents had a valid warrant on the preceding Friday."); *Kaplan*, 895 F.2d at 623; *Carter*, 854 F.2d at 1107 ("[T]he question is not whether there were two entries pursuant to the warrant, but rather, whether the second search was a continuation of the first."); *United States v. Huslage*, 480 F. Supp. 870, 875 (W.D. Pa. 1979) ("The question is not whether the police went through the door of the vehicle twice, but rather, whether the search conducted at 10:00 A.M. was a continuation of the search that had been initiated at 4:10 A.M."). Second, the decision to conduct a second entry to continue the search must be reasonable under the totality of the circumstances. *See Gerber*, 994 F.2d at 1559; *see also Stack v. Killian*, 96 F.3d 159, 162 (6th Cir. 1996) ("It is well established that those who execute lawful search warrants must do so in a reasonable manner.").

A review of the relevant case law offers us guidance in the proper application of the foregoing principles. In *Bowling*, for example, the police worked until midnight to copy all the serial numbers of the suspect items, and then checked the serial numbers overnight to determine whether the property was stolen. 351 F.2d at 240-41. When they left the suspect's home, the police possessed a basis for believing that contraband remained in the residence, but chose to suspend the search until those suspicions could be confirmed. It seems apparent from these facts that the original search was not completed until the police were able either to dispel or confirm their suspicions about the equipment following a check of the serial numbers. Thus, the second entry was properly characterized as a continuation of the original search. Moreover, the decision to suspend the search and return later if the equipment proved to be stolen was unquestionably reasonable. A more intrusive alternative existed that could have obviated the need for multiple entries — i.e., the police could have seized all of the equipment in the defendant's residence at the time of the initial search and checked it at their leisure. Nevertheless, when presented with circumstances which complicated their ability to execute fully the warrant at the time of the initial entry, the police in *Bowling* made a reasonable decision to execute the warrant in a manner that required two entries, but also minimized the risk of undue interference with any legitimate property interest that the defendant may have had in the equipment.

In *Gerber*, officers executed a warrant to search the defendant's vehicle on a Friday, but did not look under the hood on that day because they were unable to locate the lever to open the hood. 994 F.2d at 1558. Instead, the officers waited until the following Monday, at which time they were able to secure the assistance of a mechanic in opening the hood without damaging the vehicle. The Eleventh Circuit concluded that the search under the hood of the vehicle performed on the following Monday — at which time the original warrant had expired — was a reasonable continuation of the original search. The court emphasized the fact that the decision to suspend temporarily the search until a mechanic

establishing the reasonableness of the second search. *See Gerber*, 994 F.2d at 1559 (observing that reasonableness of second search of vehicle was supported by fact that police had reasonable cause to believe evidence would be found under vehicle's hood, which was not searched during initial entry); *Huslage*, 480 F. Supp. at 875; *cf. United States v. D. Bowling*, 900 F.2d 926, 932 (6th Cir.) [hereinafter "*D. Bowling*"] ("[W]here an initial fruitless consent search dissipates the probable cause that justified a warrant, new indicia of probable cause must exist to repeat a search of the same premises pursuant to the warrant."), *cert. denied*, 498 U.S. 837 (1990). In the instant case, agents thoroughly searched the defendant's residence for drugs on October 8, 1999. Despite the assistance of trained drug-detection dogs, the agents found no cocaine at that time. Other than the agents' expectation that more evidence would be found, the government has not shown any basis for believing at the time that the first search was deficient in any respect. Agent Isom testified merely that he "felt that we had just not found something inside of that residence." J.A. at 309 (Suppression Hrg. at 22). If law enforcement agents could resume an already-completed search based only on a "feeling" that evidence remained on the property, there would be no limit to the number of official intrusions that could be carried out pursuant to a warrant.

Finally, we note that the government took no steps to limit the scope or intrusiveness of the second search of defendant's residence. *See Gagnon*, 635 F.2d at 769 (citing steps taken by police to minimize interference with property as factor supporting reasonableness of continued police presence after initial search was completed); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (plurality) ("[A]ny intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior

---

reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.").

"whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Id.* at 8-9.

In the instant case, we conclude that the circumstances did not justify the second entry and search of defendant's residence on October 9, 1999. Initially we note that here, unlike many of the cases in which continuation searches were approved, nothing impaired the ability of the agents to execute fully the warrant at the time of their initial entry. *See, e.g.*, *Gerber*, 994 F.2d at 1559; *Gagnon*, 635 F.2d at 769; *Huslage*, 480 F. Supp. at 875 (holding that it was reasonable to renew search of automobile the morning after the search was begun because "[i]nadequate lighting prevented the police from thoroughly searching the vehicle at 4:10 A.M."). Agent Isom's decision to conduct two complete searches of the defendant's residence over a period of two days, therefore, was in no sense necessary or important to the successful execution of the search warrant. *Cf. Ramirez*, 523 U.S. at 71 (noting that destruction of property during execution of lawful warrant may violate Fourth Amendment if "[e]xcessive or unnecessary"); *Dalia*, 441 U.S. at 248 n.8 (finding covert entry was reasonable means of effecting wiretapping warrant where district court found that "the safest and most successful method of accomplishing the installation of the wiretapping device was through breaking and entering [the office]" (quotation omitted)).

Moreover, the government has not shown that, at the time of the second search, the agents possessed a reasonable basis for believing that undiscovered evidence remained in the defendant's home.[2]  Such a showing, we think, is critical to

---

[2]The government points to the cocaine seized from the defendant at the time of his arrest and the evidence seized during the initial search as new indicia of probable cause to believe that drugs were located on the property. The government's argument misses the point. This evidence certainly confirmed the government's suspicion that Keszthelyi was guilty of criminal conduct, but it provided little basis to believe that narcotics were located *in his home* notwithstanding the fact that a thorough search of the residence the day before did not locate any drugs. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a

was available was a reasonable one in the face of an "unexpected obstacle" to the completion of their search. *Id.* at 1561.  The court explained:

> [T]he agents reasonably decided to wait until the following Monday, when they could acquire the assistance of an automobile mechanic in opening the hood rather than damage the car, a *reasonable* rationale. Clearly, a more intrusive alternative existed: they legitimately could have pried the hood open and damaged the car on Friday to complete the search.

*Id.* at 1559.  *Gerber* is an excellent illustration of the kind of situation in which a second entry is properly characterized as a continuation of an earlier search.  The officers in *Gerber* knew before postponing the initial search that they wanted to look under the vehicle's hood, and had probable cause to believe that evidence would be found there. *Id.*  In attempting to complete this aspect of their search, however, they encountered an obstacle that impeded their access to an area which the officers had a legal right to examine.  Although they could have gained access to the area at the time of the initial execution, the circumstances gave rise to a reasonable decision to postpone the search until a later time when the search could be accomplished in a less intrusive manner.

In *Gagnon*, 635 F.2d 766, a group of hunters discovered a remote warehouse containing what appeared to be marijuana. They notified the police, who obtained a warrant to search the warehouse.  Upon execution of the warrant, the police discovered a large volume of marijuana being dried on several large tarpaulins.  The police were unable to transport all of the marijuana in their cars at that time, so several of the officers remained on the property to secure the premises until a vehicle capable of transporting the marijuana arrived the following day.  *Id.* at 768.  The Tenth Circuit rejected defendant's contention that the police exceeded the authority of the warrant by remaining on the premises.  The court noted its agreement with the general rule that a warrant expires once it has been fully executed. *Id.* at 769.  Nevertheless, the court

"conclud[ed] that exigent circumstances in this case prevented full execution of the warrant" at the time of the initial entry. *Id.* The court explained that the decision to remain on the property was reasonable, given the need to secure the evidence and the fact that the police took steps, such as sleeping in their vehicles, to minimize the intrusiveness of their continued presence of the property. *Id.*

### (1)  Continuation vs. New Search

Guided by the foregoing discussion, we conclude that the October 9 search of Keszthelyi's residence satisfies neither aspect of the reasonable continuation rule. First, we conclude that the October 9 search was a separate search, requiring its own authorization by either a separate warrant or a recognized exception to the warrant requirement, rather than a continuation of the original search on October 8, 1999. We note that a search conducted pursuant to a lawful warrant may last as long, and be as thorough, as reasonably necessary to fully execute the warrant. *United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997). Thus, law enforcement agents generally may continue to search the premises described in the warrant until they are satisfied that all available evidence has been located. *United States v. Menon*, 24 F.3d 550, 560 (3d Cir. 1994) ("Any reasonable agent looking for evidence in a clearly circumscribed area would continue the search until she was certain that no more evidence existed which could not happen until the entire [area] was searched."). Once the execution of a warrant is complete, however, the authority conferred by the warrant terminates. *Bills v. Aseltine*, 958 F.2d 697, 702 (6th Cir. 1992) ("[T]he execution of the first warrant was complete by the time Meisling arrived at plaintiff's home. Therefore, it cannot be maintained that the officers were acting 'in execution of the warrant' at the time Meisling was permitted to 'tour' the premises."); *see also United States v. Freeman*, 685 F.2d 942, 953 n.6 (5th Cir. 1982). In the instant case, law enforcement agents searched Keszthelyi's residence on October 8, 1999, until they were content that all available evidence had been located. The testimony at the suppression

hearing did not indicate that any aspect of the search was left incomplete when the agents terminated the search at approximately 5:00 p.m., or that the agents were unable to search any area specified in the warrant during the October 8 search. It is undisputed that the agents could have stayed longer if they believed that any evidence remained in the house. Agent Isom admitted that the search conducted on October 8 was a thorough one, and that drug detection dogs were used to attempt to locate narcotics. The thoroughness of the original search is underscored by the range of items seized at that time, including electronic surveillance equipment, business records, various bottles of pills, and even defendant's last will and testament. Thus, we think that when the agents terminated their search of the defendant's residence on October 8, 1999, the search was complete and the warrant was fully executed. If the agents desired to conduct an additional search after that time, we think they were required to apply for a new warrant or identify a valid exception to the warrant requirement authorizing re-entry.

### (2)  Fourth Amendment Reasonableness

Even if we were to assume that the second entry into defendant's home on October 9, 1999, was a "continuation" of the original search, the continuation search would nevertheless fail the Fourth Amendment's reasonableness requirement. We acknowledge that "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). It is always the case, however, that "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Id.* at 258; *see also United States v. Ramirez*, 523 U.S. 65, 71 (1998). The reasonableness of a search under the Fourth Amendment is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quotation omitted). Reasonableness depends upon