UNITED STATES of America,

v.

Devon J. KELLY, Defendant.

No. CR.A. 02–0511(JR).

United States District Court, District of Columbia.

May 29, 2003.

5. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.

David B. Deitch, Assistant U.S. Attorney, Washington, DC, for United States.

Iris Bennett, Assistant Federal Public Defender, Washington, DC, for Defendant.

### MEMORANDUM ORDER

ROBERTSON, District Judge.

Defendant Devon Kelly is charged by indictment with one count of unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by a term of imprisonment exceeding one year, 18 U.S.C. § 922(g)(1). The firearm was found in Kelly's automobile by officers of the Metropolitan Police Department (MPD) on November 17, 2002. Kelly has moved to suppress the physical evidence of the firearm, arguing that the MPD officers violated his Fourth Amendment rights when they recovered the gun. For the reasons set forth below, that motion is denied.[1]

### Background

On November 17, 2002, at around 4:30 in the morning, Officer Michael Architzel of the MPD, on patrol at the time, responded to a call reporting an injured man at the intersection of Kenilworth Avenue and Quarles Street, Northeast, in the District of Columbia. Initially, the report Architzel received was of a man shot in the head, but before reaching the location, he was informed that he was actually responding to a traffic accident. Transcript of May 1, 2002 Hearing ("Tr.") at 7. Architzel was the first officer to arrive at the scene.

---

1. Kelly has also moved to suppress certain statements he made to the police. On May 1, 2003, the motions hearing in this case was adjourned before the testimony concerning the suppression of statements was completed, with the understanding that, if the motion to suppress physical evidence was denied, I would resume hearing evidence on the statement suppression issues at a later time. Since that testimony has yet to be completed, the summary of facts in this memorandum will recount only those facts pertinent to the suppression of physical evidence.

Architzel described Quarles and Kenilworth as forming a "T intersection," Tr. at 7, in that Quarles Street ends at the intersection with Kenilworth. *Id.* Straight across from the end of Quarles Street, on the far side of Kenilworth, is a guard rail. *Id.* At the intersection, Architzel observed a white Chevrolet Blazer that had struck the guard rail. The front of the Blazer was touching the guard rail, part of the Blazer was on the grass, and the rear end of the Blazer was protruding onto Kenilworth Avenue. Tr. at 8.

Architzel saw that a man, whom Architzel identified at the hearing as Kelly, was "jammed in" the driver's side window of the Blazer, Tr. at 8. Kelly's lower legs were caught in the window, while his body was sitting upright outside of the window, and his arms were thrashing about. *Id.* He was emitting various "unintelligible noises." Tr. at 19. As Architzel approached Kelly, he observed foam emanating from Kelly's mouth and a glazed look in his eyes. Tr. at 9. Architzel attempted to extricate Kelly from the car window, but could not. Tr. at 10.

At around that time, two other policemen—Officer Ronald Burgeson and Sergeant Foster—arrived on the scene. Burgeson grabbed Kelly, so that he would not fall, while Architzel entered the Blazer from the passenger side (the first entry) in order to lower the window in which Kelly was stuck. Tr. at 39. While Architzel was in the car for this purpose, he observed on the floor of the driver's side a gun box, which he recognized because, in his experience as a police officer, "numerous officers use just such a box to store their personal weapons in," himself included. Tr. at 11. He searched neither the box nor the car at that time, however, and instead lowered the window so that his colleagues could remove Kelly.

Once Kelly had been removed from the vehicle, the officers attempted to ascertain his identity, since they had already determined that Kelly needed hospitalization, and because Kelly had been involved in a traffic accident. Tr. at 12. They asked Kelly directly, but he was "incoherent," Tr. at 11, and provided no information. After a search of Kelly's pockets revealed no identification, Architzel, along with Officer Henderson who had arrived on the scene, entered the car (the second entry) to look for a driver's license in the glove compartment, and to search for the gun that would presumably accompany the gun box Architzel had previously seen. Tr. at 12, 15. Henderson opened the glove compartment, found Kelly's license, and closed the glove compartment. Tr. at 22. Architzel searched the passenger compartment, Tr. at 15, and he opened the gun box, Tr. at 63, but he found no gun.

Soon thereafter, an ambulance arrived. Kelly, accompanied by Burgeson, was taken to Howard University Hospital. Architzel stayed on the scene of the accident. He first attempted to ascertain who owned the Blazer, which bore District of Columbia temporary license plates. Architzel "ran" the car's Vehicle Identification Number (VIN) with the dispatcher, Tr. at 14, but the only information that came back was that the car was "an untagged vehicle in the state of Pennsylvania with no ownership information." *Id.* At this point Architzel entered the car again (the third entry), this time to look in the glove compartment for the registration. Tr. at 13. The glove compartment in this car was situated next to a center console that held a DVD player. Architzel testified that, as he opened the glove compartment, the door of the glove compartment "must have caught the corner of the center console and it basically just pushed it [the center console] out about two or three inches." Tr. at 32. As the center console slipped

out of place, Architzel spotted the butt end of a gun behind the console. Tr. at 33. He removed a "D.C. bill of sale/registration," Tr. at 15, from the glove compartment, and let go of the door of the glove compartment. The glove compartment snapped shut, and the center console slid back into place. Tr. at 33. Architzel then notified the crime scene search unit so that they could recover the gun, which turned out to be a Baretta 9 millimeter pistol, Tr. at 16, and he called the MPD officers at the hospital to advise them to place Kelly under arrest for possession of the firearm. Tr. at 31. Finally, Architzel moved the car, which was partially still jutting out onto Kenilworth Avenue, to a legal parking spot on the street. Tr. at 16.

## Analysis

■ The Supreme Court's Fourth Amendment analysis "has traditionally drawn a distinction between automobiles and homes or offices . . . [and] warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not." *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (internal citations omitted). Nonetheless, "a car's interior as a whole is . . . subject to Fourth Amendment protection from unreasonable intrusions by the police." *New York v. Class,* 475 U.S. 106, 114–15, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). As all of Architzel's searches of Kelly's car were undertaken without a warrant, it was incumbent upon the government to show that the searches were justified. The parties focused their briefing and argument on Architzel's third entry, and rightly so, as it was the third entry that yielded the pistol. However, a brief discussion of the first two entries is in order.

### The First Entry

■ Architzel effected the first entry in order to assist Kelly, who was in obvious distress. It is well settled that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *see Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency"), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963). The first entry into Kelly's car was wholly justified by the officer's duty to aid Kelly.

### The Second Entry

■ The second entry into Kelly's car involved two distinct searches: Henderson searched the glove compartment for Kelly's license, while Architzel searched the car and the gun box for a gun. Both searches were reasonable. The first search, for Kelly's license, was justified as a continued attempt to aid Kelly, who was in need of medical assistance. Kelly could not identify himself, and he had no identification on his person. The Eighth Circuit Court of Appeals dealt with a similar situation in *United States v. Haley,* 581 F.2d 723 (8th Cir.), *cert. denied,* 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 681 (1978), where a police officer came upon a man who had been involved in an accident and who had been rendered unconscious. The officer, in an attempt to ascertain the man's identity, searched a briefcase in the man's car, turning up both the man's license and a firearm. *See id.* at 725. In rejecting Haley's argument that the firearm should have been suppressed, the Court held that "[i]t was . . . reasonable for the officer to seek identification or medical alert cards which might be of assistance. When he

found no identification on Haley's person, it was reasonable to seek to obtain identification from what the officer believed to be Haley's briefcase." *Id.* at 726.

■ Architzel's contemporaneous search for a weapon was justified for a different reason. A police officer may conduct a warrantless search of an automobile if the officer has probable cause to believe that the vehicle contains contraband or an illegal weapon. *See Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543 (1925). During that search, the officer may also open any containers found in the automobile that may be holding the object of the search. *See United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *United States v. Turner,* 119 F.3d 18, 20 (D.C.Cir.1997).

■ "Probable cause to search exists where in view of the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Gilliam,* 167 F.3d 628, 633 (D.C.Cir.1999) (internal quotation and citations omitted). Here, the presence of a gun box established a fair probability that a gun could be found somewhere in the car, and so Architzel had probable cause to search both the gun box and the car for the gun. *Cf. United States v. Bonitz,* 826 F.2d 954, 958 (10th Cir.1987) ("[T]he gun case and the various potentially explosive items gave probable cause to seek a search warrant").

### The Third Entry

The third entry, which involved Architzel reentering the car in order to find the car's registration, is more problematical, and the government has offered at least five arguments to justify it. This case turns out to be yet another proof of Occam's Razor—that plurality should not be posited without necessity—as the correct answer is the simplest one, but a brief review of the government's contentions is warranted, if only to demonstrate how needlessly convoluted Fourth Amendment theory has become. The pretzel shapes into which the government has twisted its arguments show how far the case law has departed from the notion that it might serve as a useful guide for police officers.

■ The government actually presses only three of its five arguments.[2] First, the government asserts that, at the time of the third entry, probable cause still existed to believe that a gun was present in the car.[3] Second, the government argues that because the policemen suspected that Kelly was under the influence of a narcotic, probable cause existed to believe that narcotics could be found in the car, thereby justifying a search of the car. Finally, the government believes that the final search was justified as a search incident to arrest.

**2.** The government's initial brief opposing the motion to suppress did not proffer any of these three arguments, but instead relied on two others: that Kelly lacks standing to make a Fourth Amendment argument, and that the pistol would have been inevitably discovered. The government abandoned those two arguments at the motions hearing, *see* Tr. at 86, 91.

**3.** As the government points out, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*

*v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see United States v. Bookhardt,* 277 F.3d 558, 565 (D.C.Cir.2002) (arrest lawful if probable cause existed to arrest defendant for any violation, even if there was no probable cause to arrest on offense defendant was actually charged with). Under the rationale of these cases, if Architzel had probable cause to search the car, his actual reasons for searching it are irrelevant.

1. *Probable Cause to Believe a Firearm Was in the Car.*

 The first argument ignores the fact that, by the time of the third entry, Architzel had already searched both the gun box and the passenger compartment of the car for the gun. Tr. at 15. Neither a warrant nor a warrantless justification to search is unlimited as to time and circumstance. Unquestionably, when there is probable cause to believe that contraband might be found in a car, police officers may "decide in good faith to delay their search for a more opportune time or place." *United States v. Whitfield*, 629 F.2d 136, 141 (D.C.Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981); *see United States v. Johns*, 469 U.S. 478, 484, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) ("There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure"). If a search has already been done and nothing has been found, however, the probable cause that justified that search has dissipated, unless a fresh reason appears to rekindle probable cause, and a further search of the same location may not be conducted. *See United States v. Keszthelyi*, 308 F.3d 557, 573 (6th Cir.2002) (holding that second search of same premises was unreasonable when there were no new facts to renew probable cause); *United States v. Bowling*, 900 F.2d 926, 932 (6th Cir.) (evincing "disfavor of repeated searches of the same premises where the same set of facts constitute the probable cause for each search") (citing *Filippelli v. United States*, 6 F.2d 121, 125 (9th Cir. 1925)), *cert. denied*, 498 U.S. 837, 111 S.Ct. 109, 112 L.Ed.2d 79 (1990).

Here, Architzel had already searched for the gun during his second entry into the car. There is nothing in the record to indicate that Architzel considered that search incomplete. In *Keszthelyi*, the Sixth Circuit stated that "the government has not shown that, at the time of the second search, the agents possessed a reasonable basis for believing that undiscovered evidence remained in the defendant's home. *Such a showing, we think, is critical to establishing the reasonableness of the second search.*" 308 F.3d at 572 (emphasis supplied) (footnote omitted). Indeed, the reasonable inference to be drawn from this record is that Architzel thought he had completed his search for the gun, or else he would have continued the search after Kelly was taken to the hospital. Since Architzel had already conducted a fruitless search for the gun, probable cause to believe that a gun was in the car had dissipated. The third entry cannot be justified on that basis.

2. *Probable Cause to Believe Narcotics Were in the Car.*

 The second argument, asserting probable cause to believe that narcotics were located in the car, fails for essentially the same reason that the first argument fails. A police officer's observation of a person who is or has been driving under the apparent influence of a narcotic[4] may give rise to probable cause to believe that the narcotic is present in the vehicle. *See Foote v. Spiegel*, 118 F.3d 1416, 1426 (10th Cir.1997) ("It may be reasonable to believe a person driving while under the influence of marijuana could have marijuana in a pocket, a bag, or other container, or somewhere in the vehicle"); *Grundstrom v. Beto*, 273 F.Supp. 912, 916 (N.D.Tex.1967); *see also United States v. Robinson*, 471 F.2d 1082, 1094 n. 16 (D.C.Cir.1972) ("The main exceptions to [the then] rule [of no search allowable incident to traffic arrest] are arrests for driving under the influence

---

**4.** It must be noted that no officer observed Kelly driving the vehicle here.

of alcohol or narcotics. These arrests may—though not necessarily in every case—be predicated on facts which also constitute probable cause to believe that alcohol or narcotics will be discovered in a search of the person or vehicle"), *rev'd on other grounds,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Even if the initial circumstances of this case made it reasonable to believe that PCP was located in the car, however, Architzel had already been in the car twice without seeing—or smelling—any evidence of the drug, and had conducted a search on one of those occasions of entry. When that search yielded no evidence of PCP, probable cause to believe that there was PCP in the car no longer existed.

### 3. *Search Incident to Arrest.*

■ The government's final theory is that, since probable cause existed to arrest Kelly either for reckless driving or for driving under the influence, the third entry can be justified as a search incident to arrest. In *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Supreme Court held that a police officer who has made a lawful custodial arrest of the occupant of a vehicle may, as a contemporaneous incident of the arrest, search the entire passenger compartment of the vehicle. "To qualify for the [search incident to arrest] exception, (i) the arrest must be lawful, and (ii) the subsequent search must not exceed the scope permitted by the exception." *United States v. Wesley,* 293 F.3d 541, 545 (D.C.Cir.2002).

■ Since Kelly was not under arrest at the time of the third entry, the government's argument apparently simply dispenses with the first element of this doctrine—lawful custodial arrest—and urges the lawfulness of a "search incident to probable cause to arrest." This mutation

of the search incident to arrest doctrine is unacceptable. A search incident to an arrest may be performed before the formal act of arresting a person, *see Rawlings v. Kentucky,* 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (search incident to arrest lawful when probable cause to arrest had existed and "formal arrest followed quickly on the heels of the challenged search"), but a search cannot be incident to arrest if there is no actual arrest. *See United States v. Hawkins,* No. 00–CR–53–BS, 2001 WL 103542 at *9 (D.Me. Feb. 6, 2001) (even though police had probable cause to arrest defendant, search could not be justified as incident to arrest when defendant was not actually arrested); *United States v. Dimick,* 790 F.Supp. 1543, 1552 (D.Colo.1992) ("Since the justifications for a warrantless search incident to arrest are premised on the exigencies created by a valid actual arrest, there is no basis, theoretical or practical, for treating this as a search incident to arrest" when probable cause to arrest existed but no arrest had been made) (internal citations omitted); *Timberlake v. Benton,* 786 F.Supp. 676, 688–89 (M.D.Tenn. 1992).

The Supreme Court case *Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), also cuts against the government's position. In that case, defendant Knowles had been stopped for speeding. Iowa law allowed the officer to either issue a citation or to arrest Knowles for that infraction. The officer chose to issue a citation, but also proceeded to search Knowles's car, a process that turned up marijuana and drug paraphernalia. *Id.* at 114, 119 S.Ct. 484. The Supreme Court unanimously held that, even though the officer could have arrested Knowles under Iowa law, the search could not be justified as incident to an arrest

when the officer simply issued a citation. *Id.* at 116–17, 119 S.Ct. 484.

■ In the instant case, even assuming that probable cause existed to arrest Kelly for either reckless driving under D.C.Code § 50–2201.04 or driving while under the influence of liquor or drugs under D.C.Code § 50–2201.05, Kelly was not actually arrested under either of these provisions.[5] The third entry was not justified by Kelly's subsequent arrest for possession of the gun that was only discovered during the third entry. *See Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("It is axiomatic that an incident search may not precede an arrest and serve as part of its justification") (internal citations omitted).

4. *Occam's Razor.*

■ Even though all of the justifications for the third entry offered by government counsel have failed, the evidence will not be suppressed, because Architzel himself articulated an appropriate basis for the third entry: that he was looking for the car's registration in order to establish ownership of the vehicle. Tr. at 14. As Professor LaFave instructs, in certain unusual circumstances, "it is reasonable for the police to make a limited search of a vehicle in an effort to determine ownership." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.4(d) (3d ed.1996). For instance, a police officer who encounters an abandoned car on a public highway may search the vehicle for the registration. *See Muegel v. State,* 257 Ind. 146, 272 N.E.2d 617, 620 (1971); LaFave, *supra,* § 7.4(d); *see generally Opperman,* 428 U.S. at 368–69, 96 S.Ct. 3092 (police may remove and impound vehicles abandoned on the street).

More to the point, courts in several jurisdictions have held it reasonable for a police officer to reach into the glove compartment of a car for the registration if "the operator of the motor vehicle is unable to produce proof of registration...." *State v. Jones,* 195 N.J.Super. 119, 478 A.2d 424, 426 (1984); *Quezada v. Hubbard,* No. C 01–02303, 2002 WL 1598873 at *3 (N.D.Cal. July 18, 2002) (officer's looking into car's armrest in search of registration after traffic stop was reasonable when defendant failed to produce registration); *State v. Taras,* 19 Ariz.App. 7, 504 P.2d 548, 552 (1972) ("[W]e conclude that if a driver is unable to produce proof of registration, the officer may conduct a limited search of the car for evidence of automobile ownership"). The state courts of New Jersey have adopted a sagacious approach to the issue: in the event of a traffic stop, a police officer must afford a driver a reasonable opportunity to retrieve his registration, but if the driver fails or is unable to do so, the officer may perform a limited search for the paperwork in those areas where it might be found, such as the glove compartment. *Jones,* 478 A.2d at 426.

The Supreme Court dealt with a roughly analogous situation in *New York v. Class,* 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986). In that case, two New York City police officers had stopped a car for a traffic violation. One of the officers, seeking to view the vehicle's VIN, reached into the car to move some papers that were obscuring the area of the dashboard where the VIN is usually located, and, as he was engaged in this activity, he saw a gun in the car. *Id.* at 108, 106 S.Ct. 960. The Court held that the officer's action in entering the car was constitutional, as "[t]he search was focused in its [legitimate] ob-

---

5. The government has not argued—let alone shown—that Kelly would have been "inevita-

bly" arrested for these offenses.

jective [of viewing the VIN] and no more intrusive than necessary to fulfill that objective." *Id.* at 118, 106 S.Ct. 960.

■ "The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (footnote omitted). A search of a glove compartment is more intrusive than the search in *Class*—the Court's rationale in *Class* was partly based on the fact that the VIN can usually be observed from outside of a car, *see* 475 U.S. at 114, 106 S.Ct. 960—but "determination of ownership" by looking into a glove compartment "involves only a slight incursion on privacy." *United States v. Ferri,* 357 F.Supp. 487, 490 (W.D.Wis.1973). The invasion of an individual's privacy is further diminished if the search for the vehicle registration has been preceded by an unheeded request that the individual turn over the registration him or herself. Furthermore, such a search is limited to the places where a registration would usually be found—specifically, the glove compartment of the vehicle. While the intrusion is slight, the governmental interest is quite significant. Police officers need to know ownership information of vehicles involved in traffic violations and accidents, and of abandoned vehicles. When a law enforcement officer is investigating a traffic violation or an accident, and the driver is unwilling or unable to produce the registration of the vehicle involved to the officer upon demand, it is reasonable for the officer to conduct a limited search for the registra-

tion in those areas where the registration would likely be located.

Under this exception to the Fourth Amendment's proscription against warrantless searches, Architzel needed neither a warrant nor probable cause to enter the car to look for the registration. Kelly, whose incoherence had prevented him from providing any information, had already departed in an ambulance for the hospital. Architzel had run a check on the car's VIN but had not been able to ascertain the identity of the owner. With the car still half positioned in the middle of the street, and with an accident report waiting to be filled out, Architzel reasonably reached into the glove compartment, seeking the car's registration. *See State v. Gammons,* 113 N.J.Super. 434, 274 A.2d 69, 71 (1971) (when defendant had been in an accident and was in hospital, thus unable to produce registration, officer's search for registration in vehicle glove compartment was reasonable). The lawful act of opening the glove compartment brought the pistol into plain view,[6] and the subsequent seizure was therefore lawful. *See Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (plain view doctrine allows seizure of contraband if officer is lawfully located in the place from where the object is seen, has a lawful right of access to the object, and the incriminating character of the object is readily apparent).

\* \* \* \* \* \*

The motion to suppress the firearm is **denied.** The Clerk will communicate with the parties to schedule a continuation of

---

**6.** Defense counsel, at the motions hearing, suggested that Architzel's explanation of how the center console of the dashboard came open "strains credibility." Tr. at 88. I disagree. Architzel's explanation was detailed and reasonable. Tr. at 32–34. The hypothe-

sis that the car's having struck the guardrail pushed various sections of the dashboard out of alignment, thereby causing the center console to come open when the glove compartment was opened, hardly "strains credibility."

the hearing on the suppression of Kelly's statements.