*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0267p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-5547

ALBERTO RUIZ SALAS,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 04-00011—Curtis L. Collier, Chief District Judge.

Submitted: April 27, 2006

Decided and Filed: August 1, 2006

Before: SUHRHEINRICH, GILMAN and ROGERS, Circuit Judges.

---

### COUNSEL

**ON BRIEF:** Joseph V. Hoffer, Cleveland, Ohio, for Appellant. Perry H. Piper, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

---

### OPINION

---

SUHRHEINRICH, Circuit Judge. Defendant Alberto Ruiz Salas, who pleaded guilty to one count of possession with intent to distribute 500 grams or more of powder cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), challenges the sentence imposed. Specifically, Salas contests the district court's conversion of cash into cocaine in order to estimate the quantity of drugs he possessed for the purposes of sentencing, and the court's determination of his role in the offense. For the reasons that follow, we **AFFIRM**.

### I. Background

On December 15, 2003, Lieutenant Bobby Queen of the Tenth Judicial Drug Task Force in Bradley County, Tennessee, stopped Salas on the interstate for traffic violations. As the officer approached the vehicle, he detected a very strong odor of perfume or air freshener and noticed that Salas "exhibited nervous and unusual behavior." Queen also noticed that Salas's primary language was Spanish. The officer observed that the vehicle was a rental car. Using a preprinted card containing law enforcement phrases in Spanish, Queen asked to see the rental agreement and Salas's driver's license. The rental agreement indicated that the car had been rented two days before in

1

Miami, Florida. Queen asked Salas where he was going. Salas, who was traveling south on the interstate, said that he had been visiting family in Kentucky and was returning home. The officer then asked to search the vehicle. Salas assented.

Queen initially observed a straw with white powder residue in a small plastic bag in the ash tray on the dashboard. He found a styrofoam cooler in the trunk. The officer tapped the sides of the cooler and determined that the sides had hollow spots. He opened the cooler and found $20,157 in cash hidden in one sidewall of the cooler, along with 2,886 grams of cocaine wrapped in plastic and covered with axle grease to mask the scent.

Queen called Agent Mike Hall, also of the Tenth Judicial District Drug Task Force, to the scene. Salas was arrested and subsequently given his *Miranda* warnings in Spanish. Salas signed a rights waiver form and cooperated with the officers. At the detention hearing Hall testified Salas indicated that he was offered $1,000 by an unknown individual in Miami to travel to Kentucky to pick up a package and then drive it back. Salas thought at the time that he was retrieving only money, and that when he saw the cocaine, he got nervous and sprayed it down with cologne and air freshener. Salas also stated that this was the only time that he had ever been involved in drug trafficking.

On January 13, 2004, a federal grand jury charged Salas with possession with intent to distribute 500 grams or more of powder cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). A superseding indictment was later returned on August 10, 2004, restating the original charge and adding sentencing allegations to reflect that the total amount of drugs involved was at least 3.5 kilograms.[1] An agreed factual basis was filed, in which Salas stipulated that the cocaine quantity was consistent with possession with intent to distribute and, including the other acts, at least 3.5 kilograms of cocaine were involved.

On November 18, 2004, Salas pleaded guilty to the superseding indictment without a written plea agreement. At the hearing, Salas's counsel emphasized that his client was stipulating to the amount of cash and the amount of cocaine in Salas's possession, but not to the conversion of money to a drug equivalency amount. In other words, he agreed only to the 2,886 grams of cocaine for sentencing purposes.

The presentence report ("PSR") used the 3.5 kilogram amount, and calculated Salas's base offense level at 30.[2] Salas was given a three-level reduction for acceptance of responsibility, for a total offense level of 27. With a criminal history category of I, Salas's Guideline range was 70 to 87 months.

Salas filed objections. Significantly, he objected to the conversion of money into drugs, and further claimed that he should have been granted a minor role adjustment.

A sentencing hearing was held on March 18, 2005. At the hearing Drug Enforcement Agency Agent David Shelton testified that in the Chattanooga area, the average cost of a kilogram of cocaine ranged from $18,000 to $22,000, with $20,000 being the average. Shelton also estimated

---

[1]The "Sentencing Allegations" state:
> The Grand Jury further charges that the offense set forth in Count One, together with other acts of the Defendant that were part of the same course of conduct and common scheme or plan as that offense involved at least 3.5 kilograms of cocaine hydrochloride [U.S.S.G. § 2D1.1(c)(5)].

[2]The Sentencing Guidelines set the base offense level at 30 when at least 3.5 kilograms but less than five kilograms of cocaine is involved. U.S.S.G. § 2D1.1(c)(5). The Guidelines set the base offense level at 28 when the amount of cocaine is at least 2 kilograms but less than 3.5 kilograms. U.S.S.G. § 2D1.1(c)(6).

that the cost of a kilogram of cocaine in the Miami area as approximately $18,000. Shelton therefore opined that, because the cooler contained almost three kilograms of cocaine along with $20,000, there probably had been a fourth kilogram of cocaine that had been sold, and that Salas was transporting the money and the unsold kilograms back to Miami. Salas offered no evidence regarding the conversion of cash to a drug equivalency.

As for his role in the offense, Salas offered and the district court admitted pages from the preliminary hearing transcript containing the testimony of Agent Hall. Salas asserted that the transcript demonstrated that Hall was aware of Salas's limited knowledge of the scope of the offense, and that he was a one-time mule.

The district court denied Salas's objection regarding conversion of the money into an equivalent quantity of cocaine. The district court also found that the money related to the cocaine purchased, as it was in the same container as the cocaine in a hollowed-out portion of the cooler. The court found it reasonable to infer that the $20,000 cash was from the sale of a kilogram of cocaine. The district court also rejected Salas's argument that he should have received a reduction in the offense level for his role in the offense, because Salas was held responsible only for the drugs and cash found in his possession. The court further noted that it had not considered the criminal activities of anyone else, and that it was undisputed that Salas knew he was committing an offense and knew the quantity of the drugs involved.

Treating the Guidelines as advisory pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the district court held that a sentence of 70 months was appropriate, after taking into account Salas's background (namely that he had no criminal history), as well as the need for deterrence and rehabilitation. The court also recommended that Salas receive 500 hours of substance abuse treatment while incarcerated and that Salas be placed as close as possible to the Miami area (where his family is located). Salas appeals.

## II. Analysis

### A. Drug Quantity

Salas argues that the evidence was insufficient to support the district court's determination that the $20,157 in cash seized from the cooler was related to his drug offense and asserts that the money should not be included in determining his base offense level. Salas therefore asserts that the scale of the offense was accurately reflected by the amount of cocaine actually discovered.

Salas's base offense level for the crime of possession with intent distribute cocaine is determined pursuant to U.S.S.G. § 2D1.1. The commentary to § 2D1.1 of the Sentencing Guidelines instructs that

> [t]ypes and quantities not specified in the count of conviction may be considered in determining the offense level. *See* § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.

U.S.S.G. § 2D1.1, cmt. n.12 (2004).[3]

---

[3] Section 1B1.3(a) in turn provides that the base offense level "shall be determined on the basis of the following: . . . (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). In this case, Salas could have been

As part of this determination, the court may consider "the price generally obtained for the controlled substance." *Id.* This Court has previously approved the conversion of seized funds into an equivalent amount of drugs, *United States v. Keszthelyi*, 308 F.3d 557, 577 (6th Cir. 2002) (and cases cited therein), as long as the government proves by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio, that is, the price per unit of drugs, *id.* (and citation therein); *see also United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004) (same), *cert. denied,* 543 U.S. 1129 (2005). The district court should err on the side of caution in making this estimate. *Keszthelyi*, 308 F.3d at 577.

Although the Guidelines are now merely advisory after *Booker*, "[s]entencing courts must still take the guidelines into account . . . [including] what the guidelines say in their precatory voice and giving appropriate consideration to the statutory factors that have always been relevant under the Sentencing Reform Act." *United States v. Forrest*, 402 F.3d 678, 684 (6th Cir. 2005); *United States v. McMahan*, 129 F. App'x 924, 932 (April 26, 6th Cir. 2005) (unpublished opinion (remanding for determination of whether district court correctly converted cash the defendant possessed at the time of his arrest to cocaine for sentencing purposes post-*Booker*; citing *Forrest*). Further, such post-*Booker* fact-findings can be based on a preponderance of the evidence. *See United States v. Mickens*, _ F.3d _, No. 05-3377, 2006 WL 1806000, at *4 (6th Cir. July 3, 2006) (and cases cited therein).

The district court did not clearly err in including the cash in its determination of Salas's offense conduct. *See United States v. Katzopoulos*, 437 F.3d 569, 578 (6th Cir. 2006). Salas pleaded guilty and stipulated that he traveled from Miami to Kentucky for the purpose of picking up money for transport back to an individual in Miami. Salas knowingly accepted the money along with the cocaine. The cocaine and the $20,000 were found in an Igloo cooler. The insulation in the cooler was cut into four areas. Both the cocaine and the money were found in these cut-out areas. These facts support a reasonable inference that the money was the proceeds from the sale of cocaine, and therefore part of the same conspiracy. Furthermore, by further agreeing to transport both the money and cocaine, Salas voluntarily increased his involvement in the criminal activity.

The record also supports the district court's finding that the money represented approximately one kilogram of cocaine, at a price of $20,000. Agent Shelton testified that the average price of a kilogram of cocaine in the Chattanooga area was approximately $20,000, and in the Miami area $18,000. Shelton further concluded that the cash in the cooler represented proceeds from another kilogram of cocaine that had been sold, a reasonable assumption given its location. Thus, the government met its burden of establishing by a preponderance of the evidence both the amount of money attributable to drug activity and the conversion ratio. *See Keszthelyi*, 308 F.3d at 577.

Salas contends that the district court improperly relied on Shelton's testimony because it presumed the criminal activities of others, and Salas was acting only as a mule carrying the cocaine

---

charged with conspiracy for his part in transporting illegal drug proceeds in addition to the charge in the indictment for "knowingly, intentionally and without authority possess[ing] with the intent to distribute five hundred grams or more of a mixture or substance containing cocaine hydrochloride." Had he been separately charged, the offenses would have been grouped for purposes of determining his base offense level. *See* U.S.S.G. § 3D1.2 (including for grouping purposes offenses under §§ 2D1.1, 2D1.2). Thus, under the relevant conduct provision, they are also properly calculated together, if "they were part of the same course of conduct or common distribute five hundred grams or more of a mixture or substance containing cocaine hydrochloride." Had he been separately charged, the offenses would have been grouped for purposes of determining his base offense level. *See* U.S.S.G. § 3D1.2 (including for grouping purposes offenses under §§ 2D1.1, 2D1.2). Thus, under the relevant conduct provision, they are also properly calculated together, if they "were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see also id.* § 1B1.3 cmt. n.2.

and cash.  On direct, Shelton testified that, hypothetically, if he saw an ice chest containing approximately three kilograms of cocaine and $20,000, he would think that "at one point there were [four] kilograms of cocaine," and that the $20,000 represented proceeds from the sale of the fourth kilogram.  On cross-examination, Shelton testified that he would conclude that four kilograms had been sent from Florida, and that three were being sent back because the Kentucky purchasers could not pay for them.  The district court credited Shelton's training and experience regarding those inferences.  The court did not refer to, or rely upon, the involvement of other parties in finding it appropriate to convert the cash to an equivalent drug amount.  As noted above, these were reasonable inferences based on the facts relating to Salas's offense conduct.  Furthermore, the district court subsequently stated when denying the role adjustment that "the Court has not considered the criminal activities of anyone else."

Salas relies principally on *Sandridge* in asserting that the government has not met its burden here.  In *Sandridge*, when officers searched the defendant and his vehicle pursuant to an arrest, they found 20.9 grams of cocaine base, a set of electronic scales, and marijuana (which was not at issue in the federal case).  They also found $919 on the defendant's person.  *Sandridge*, 385 F.3d at 1034.  The district court converted the $919 in cash into an equivalent amount of cocaine, thereby increasing the defendant's base offense level, based solely on information in the presentence report that the defendant was basically an unemployed young male in possession of a fairly large amount of drugs with some history of drug dealing.  *Id.*  At sentencing, the government presented no evidence, but merely argued that the $919 in cash was about the same amount of money as could have bought the same amount of cocaine base the defendant had with him that day and therefore represented the proceeds from the defendant's sale of other cocaine base or money to buy more cocaine base.  *Id.*

This Court ruled that the district court erred in making such a determination without further evidence.

> Even assuming, *arguendo*–based on Defendant's lack of gainful employment, his admitted drug dealing, and the sizable amount of cash–that the $919 was connected to some sort of drug business, the Government failed to show by a preponderance of the evidence that the money was connected to the purchase or sale of cocaine base other than the cocaine base found in [the defendant's] car.  That is, the $919 in cash cannot be used as a proxy for an additional quantity of cocaine base above and beyond the quantity found in Defendant's car unless a preponderance of the evidence shows that the cash was either proceeds from other cocaine base that was just sold or money to purchase additional cocaine base.

*Id.* at 1037-38.  Further, the *Sandridge* court indicated that the government would have to show by a preponderance of the evidence that "the money represented proceeds from or money to purchase cocaine base, as opposed to some other drug, such as marijuana, which was also found in [the defendant's] car."  *Id.* at 1038.  The *Sandridge* court added that the facts in the presentence report "shed no light on the question of whether the $919 was related to cocaine base other than the cocaine base found in [the defendant's] car."  *Id.*

Salas's reliance on *Sandridge* is misplaced.  In this case, the cash was hidden along with the cocaine in the cooler, as Salas himself acknowledged.  Furthermore, there was a clear connection between the two–when Salas went to retrieve the money, he was also handed the cocaine.  In addition, unlike *Salas*, the government presented evidence, which the district court credited, as to both the amount of money attributable to drug activity and the conversion ratio.

In sum, the district court did not clearly err in its determination of Salas's base offense level.

## B. Role in the Offense

Salas also argues that the district court erred when it failed to grant a two-point downward departure pursuant to U.S.S.G. § 3B1.2 because his role in the offense was limited to the act of carrying a container from one location to another and he had no foreknowledge of the amount nor the extent of the illegal conduct. This argument also must be rejected. The Guidelines provide for a two-level reduction "[i]f the defendant was a minor participant in any criminal activity," § 3B1.2(b), defined as one "who is less culpable than most other participants, but whose role could not be described as minimal," U.S.S.G. § 3B1.2, cmt. n.5. Further, a defendant who is accountable under § 1B1.3 only for the conduct in which he is personally involved and who performs a limited function in concerted criminal activity is not precluded from consideration for a mitigating role adjustment. U.S.S.G. § 3B1.2, cmt. n.3(A). However, a defendant whose role has "importance in the overall scheme" for which he is being held accountable is not a minor participant within the meaning of § 3B1.2. *United States v. Salgado*, 250 F.3d 438, 458 (6th Cir. 2001). The defendant bears the burden of proving by a preponderance of the evidence that he played a minor role. *Id.*

Although Salas was convicted based on a single transportation of cocaine, he was not held accountable for other conduct and he did not establish that he played a relatively minor role with regard to this shipment. This Court has repeatedly rejected this type of claim. *See United States v. Roberts*, 223 F.3d 377, 380-81 (6th Cir. 2000) (and cases cited therein). "Simply because the court *could* have applied a minor role adjustment under the facts of this case . . . does not mean that the district court was *required* to apply the adjustment." *United States v. Garcia-Morones*, 49 F. App'x 556, 558 (6th Cir. Oct. 18, 2002) (per curiam) (holding that the defendant, who pleaded guilty to conspiracy count to distribute more than 500 grams of cocaine, was not entitled to a two-level decrease under U.S.S.G. § 3B1.2(b) where his base offense level was based upon only the amount of cocaine with which he personally dealt rather than the greater amount involved in the conspiracy; citing, *inter alia, Roberts*, 223 F.3d at 381); *see also Roberts*, 223 F.3d at 381 (stating that "when a defendant's base offense level does not reflect the conduct of the larger conspiracy, he should not receive a mitigating role adjustment simply because he was a minor participant in that broader criminal scheme"). Furthermore, the district court found that Salas participated in the transportation of cocaine with full knowledge as to both the amount of cash and the amount of drugs involved. Indeed, Salas admitted to these facts in the stipulated factual basis and pleaded guilty to the equivalent amount of cocaine as stated in the superseding indictment.

Thus, Salas was not a mere "mule" who was carrying a package with no personal knowledge as to the drug amount inside. Although limited, Salas played an indispensable role in transporting the cash and cocaine between Kentucky and Florida. He rented a car for the purpose of carrying out his role in the offense. He attempted to mask the smell of the cocaine. In short, the facts support the offense level calculation. Finally, we note that the district court sentenced Salas at the lowest end of the guideline range.

In sum, the district court did not clearly err in ruling that Salas was not entitled to the adjustment. *See Roberts*, 223 F.3d at 379-80 (noting that district court's factual findings regarding a denial of mitigating role adjustment are reviewed for both clear error while its legal conclusions are reviewed de novo).

## III. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**