**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0958n.06

**No. 12-1954**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Nov 06, 2013

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| TARIQ MAHMUD, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| Defendant-Appellant. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| | ) | |

BEFORE: ROGERS, STRANCH, and DONALD, Circuit Judges.

ROGERS, Circuit Judge. Tariq Mahmud appeals his conviction on six counts of health care fraud and one count of conspiracy to commit health care fraud. He argues that the trial court erred by giving a deliberate ignorance instruction, that the court committed plain error by failing to give the jury a limiting instruction regarding certain regulatory violations he committed, that there was insufficient evidence to support the jury's conviction, and that his sentence was procedurally and substantively unreasonable. However, each of these contentions lacks merit.

Mahmud's conviction for health care fraud arose out of his ownership of Comprehensive Rehabilitation Services (Comprehensive), a company that was supposedly in the business of providing physical and occupational therapy. Mahmud is an accountant by trade, and he never personally administered therapy to Comprehensive's clients. Rather, Comprehensive was a Medicare Provider and billed Medicare for therapy provided by subcontractors.

Mahmud, Victor Jayasundera, Fatima Hassan, Carol Gant, and Vanessa Dowell were indicted for health care fraud and conspiracy to commit health care fraud. Jayasundera, Hassan, Gant, and Dowell were all directly involved in the creation of fake patient files through Joseph Campau Physical Therapy (Campau PT). As the case progressed, each of these individuals eventually pled guilty and agreed to testify against Mahmud.

At trial, the primary evidence of Mamud's involvement in health care fraud related to his relationship with Campau PT. Campau PT was started by Jayasundera and Hassan. By Jayasundera's admission, Campau PT never treated patients—its sole purpose was Medicare fraud. Jayasundera, a licensed physical therapist, was in charge of creating fake patient files. Along with Gant and Dowell, Jayasundera would create files that included intake evaluations, treatment plans, and progress notes. Hassan was in charge of finding Medicare "patients" for Campau PT. She would recruit Medicare recipients and pay them for their signatures with prescription drugs or cash. Some patients signed undated forms that were later altered to conform to the fake files that Jayasundera and the others manufactured. Mahmud did not participate directly in the production of fake files at Campau PT. Rather, his role in the scheme was billing Medicare through Comprehensive for the services Campau PT "performed" and then remitting those payments back to Campau PT after taking a 25% cut.

Since Mahmud had no direct involvement in the creation of the files, the Government's case focused on showing that Mahmud knew or was wilfully blind to the fact that he was billing Medicare through Comprehensive for services that were never actually performed. The Government

also showed that some of the patient files submitted by Mahmud contained obvious evidence of forgery. This evidence of forgery included signatures that had been whited out, photocopied, and even physically cut and pasted onto different forms. Further, some alterations were in Mahmud's handwriting. The Government also explained that Mahmud had to certify that he agreed to abide by all of Medicare's rules and regulations in order to receive a billing number. This included an obligation to supervise the medical services performed by the medical professionals that used Comprehensive to bill Medicare. But Gant and Dowell, therapists who were supposedly providing treatment billed to Medicare by Comprehensive, testified that they had never met Mahmud.

Evidence at trial also showed that Mahmud communicated with members of Campau PT about billing issues on several occasions. Medicare denied claims from Campau PT patients with some frequency, in part because patients were receiving overlapping care (they were seeing another therapist at the same time they were supposedly receiving treatment from Campau PT). Mahmud never inquired into the reasons for these denials, but did explain to Campau PT that it could back-date its files by up to one year to avoid overlapping-care denials. Similarly, when Medicare imposed a cap on the amount of therapy it would compensate in 2006, Mahmud advised Jayasundera and Hassan that they could "bill the files up to one year back."

In 2006, Medicare contacted Mahmud because of reports of fraud from Medicare recipient James Gilleylen. Gilleylen's Medicare card had been stolen and he received several bills for treatment supposedly provided by Campau PT. In response to the inquiries Medicare made after Gilleylen reported the fraud, Mahmud told Medicare that Gilleylen had received unsatisfactory

treatment from Campau PT and therefore Comprehensive would return the payments it had received from Medicare for Gilleylen's therapy. At trial, Gilleylen denied having received any treatment from Campau PT or having spoken to any Campau PT employees or Mahmud.

Although most of the evidence at trial focused on Mahmud's relationship with Campau PT, Mahmud also had contact with other individuals involved in health care fraud. At trial, Suresh Chand explained that he had been involved with Muhammed Azeem and Shafiulla Hanif and that all three men ran companies engaged in health care fraud. Chand explained that Mahmud had approached him on several occasions attempting to buy patient files from him and that Mahmud had actually purchased files from Azeem and Hanif.

After the presentation of evidence and over Mahmud's objection, the trial judge gave an "ostrich instruction"—the jury could find Mahmud guilty if it found that he was deliberately ignorant of a high probability that Comprehensive was billing Medicare for services that were not actually provided. The trial judge never instructed the jury on how it should treat the evidence of Mahmud's violation of Medicare regulations. The jury found Mahmud guilty of six counts of health care fraud and one count of conspiracy to commit health care fraud. The pre-sentence report (PSR) recommended a base offense level of six with an eighteen-point enhancement for an intended loss of over $2.5 million, a two-point enhancement for use of sophisticated means, and a four-point enhancement for a leadership role. The judge adopted the recommendations of the PSR, but used an actual rather than an intended loss of $1.8 million for the loss calculation. This calculation resulted in an adjusted offense level of twenty-eight with a Guidelines range of seventy-eight to

ninety-seven months. The judge ultimately sentenced Mahmud to eighty-four months in prison, three years of supervised release, and ordered him to pay approximately $1.8 million in restitution. Mahmud timely appealed and argues that the trial court erred by giving the jury a deliberate ignorance instruction, committed plain error by failing to give a limiting instruction on Mahmud's regulatory violations, that there was insufficient evidence to support the conviction, and that his sentence was procedurally and substantively unreasonable.

Mahmud argues that there was not a sufficient factual basis for the district court to give a deliberate ignorance instruction. But even if the district court erred in this regard—a question we do not resolve—any error was harmless. "[W]hen a district court gives a deliberate ignorance instruction that does not misstate the law but is unsupported by sufficient evidence, it is, at most, harmless error, as long as the jury instructions, as a whole, were not confusing, misleading, or prejudicial." *United States v. Beaty*, 245 F.3d 617, 621–22 (6th Cir. 2001). The trial court instructed the jury as follows:

> If you are convinced that the defendant deliberately ignored a high probability that Comprehensive Rehab Services was billing for therapy services that were not in fact provided, you may find that the defendant knew that Comprehensive Rehab Services was billing for therapy services that were not in fact provided.
> But to find this you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that Comprehensive Rehab Services was billing for services that were not in fact provided and that the defendant deliberately closed his eyes to what was obvious. Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough to convict.

This instruction closely tracks the wording of Sixth Circuit Pattern Jury Instruction § 2.09, which accurately states the law of the Circuit. *Id.* These instructions warned the jury not to convict based

on a finding of mere negligence, as Mahmud argues occurred in this case. Mahmud's argument would require us to accept that the jury ignored the trial court's instructions; this would fly "in the face of a fundamental tenet of our jury system." *United States v. Mari*, 47 F.3d 782, 785 (6th Cir. 1995) (internal quotation marks omitted). Because we presume the jury did as it was instructed and convicted Mahmud only after it concluded he had positive knowledge, any error that the trial court may have committed was harmless.

Second, the trial court's failure to provide a limiting instruction—admonishing the jury not to consider Mahmud's violation of certain Medicare regulations in determining whether he was guilty of the charged crimes—did not amount to plain error. Because Mahmud did not request a limiting instruction, he must show that the district court's decision not to give an instruction was "(1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks omitted). The error must also "seriously affect[] the fairness integrity, or public reputation of judicial proceedings." *Id.* The Government argues that it was sufficient for the court to instruct, as it did, that Mahmud was "only on trial for the particular crimes charged in the indictment." It is true that in *United States v. Waggoner*, 207 F. App'x 576, 580 (6th Cir. 2006), we concluded on plain error review that similar instructions amounted to "appropriate limiting instructions" in the context of Federal Rules of Evidence 404(b). However, the district court's boilerplate instruction leaves much to be desired in this context—the trial court did not explain to the jury how it could and could not properly use the evidence of Mahmud's violation of Medicare regulations. A more specific instruction would have been advisable. In

*United States v. Stefan*, 784 F.2d 1093, 1099 (11th Cir. 1986), for instance, the Eleventh Circuit upheld an instruction that the jury could not consider violations of a civil banking statute as "violations of the criminal law," but that it could use evidence of civil violations "in determining whether or not the defendants had the required intent to violate the criminal laws charged in this indictment."

However, even if the trial court erred by not giving a sufficiently specific instruction, that error did not affect Mahmud's substantial rights because there was ample evidence of his guilt in the record. In *United States v. Gragg*, No. 96-5586, 1998 WL 246019, at *6–7 (6th Cir. May 7, 1998) (unpublished), for instance, we held that the failure to give a limiting instruction did not affect substantial rights considering the significant evidence against Gragg. As discussed below, there was substantial evidence of Mahmud's guilt, and the district court therefore did not commit plain error.

Third, Mahmud's argument that there was not sufficient evidence to support the jury's conviction also fails because there is substantial evidence of his guilt in the record. To prove health care fraud, the Government must show a defendant "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008) (internal quotation marks omitted). Even if Mahmud did not devise the scheme himself, he could still be found guilty by aiding and abetting another in the commission of the fraud if he: (1) contributed to the execution of the crime and (2) intended to aid in the crime's commission. *Id.* To

prove a conspiracy to commit health care fraud, the Government must "prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *Id.* at 647 (internal quotation marks omitted). Mahmud's arguments only relate to whether the Government proved that he had the requisite mental for the jury convict him of health care fraud. We do not address the other elements, as the Government overwhelmingly established that Mahmud contributed to the execution of health care fraud by Campau PT.

While it is true that the record contains no direct evidence that Mahmud knew of the fraud, "because it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom. Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (internal quotation marks omitted). Jayasundera's testimony indicated that Mahmud directed others to alter dates in patient files to maximize the amount that could be billed to medicare. The jury could conclude that Mahmud gave this advice to maximize Medicare billings regardless of when (or if) treatment occurred in order to maximize payments from Medicare, therefore indicating that he knew Campau PT was engaged in Medicare fraud. Other evidence shows that Mr. Mahmud approached Chand and others about buying fake patient files. Although this does not directly show that Mahmud knew that the files were fake, the jury could infer that fact because Mr. Mahmud repeatedly tried to buy files from individuals that later admitted to committing Medicare fraud. Further, Gilleylen testified that he had received bills for treatment from Campau PT that had been

billed to Medicare. In response to Medicare's inquiries, Mahmud wrote to Medicare and explained that "we conducted our internal inquiry and found that the patient was not pleased and satisfied for the professional services he received" and "since the patient was not satisfied the payment we received for the services should be reimbursed immediately." Mr. Gilleylen testified that he never received services from Comprehensive and never spoke to anyone at Comprehensive. From this evidence, the jury could conclude Mahmud lied to Medicare and reimbursed the money it paid for Gilleylen's "treatment" to avoid additional scrutiny, all of which suggests Mahmud knew about the fraud occurring at Campau PT.

The jury could have found alternatively that the intent element of the charged crimes was satisfied if it concluded that Mahmud was deliberately ignorant of his involvement in the fraud. *United States v. Williams*, 612 F.3d 500, 507–08 (6th Cir. 2010). Evidence at trial showed that Mahmud never supervised the medical professionals that billed through Comprehensive and that files billed by Comprehensive contained obvious evidence of fraud. The jury could conclude that Mahmud intentionally avoided supervising Campau PT's "therapists" and scrutinizing the files that they submitted to avoid learning about the underlying fraud.

Mahmud's sentencing challenges are also without merit. A district court could err procedurally by misapplying sentencing enhancements or by treating the Guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, basing the sentence on clearly erroneous facts, or failing to adequately explain the sentence. *See generally Gall v. United States*, 552 U.S. 38, 51 (2007). The district court did not err here.

The district court did not err in its calculation of the loss Mahmud intended to cause and therefore in applying a sixteen-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I). For loss calculation purposes, a court need only make a "reasonable estimate" of the loss. *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). The trial court based its calculation on the total amount that Medicare paid to Comprehensive based on all thirty-one companies that billed through it. Mahmud argues that the loss calculation should have been based only on payments to companies that the government proved were engaged in fraud and that the legitimate services he billed to Medicare should not have been included in the loss calculation. While Mahmud is correct that he should not be punished for services he actually rendered, U.S.S.G. § 2B1.1 cmt. 3(E), once the Government met its burden to prove the total amount, it was his burden to prove "the specific value" by which the loss amount should have been reduced. *Washington*, 715 F.3d at 985. Unfortunately for Mahmud, the record contains no evidence that Comprehensive billed Medicare for any services that were actually provided to patients. By contrast, the record does show that Campau PT, and the companies controlled by Chand, Azeem, and Hanif, billed through Comprehensive and engaged in fraud. Based on this evidence, it was reasonable for the trial judge to infer that all of the billings submitted by Comprehensive were fraudulent.

Nor did the district court err in applying a two-level sophisticated means enhancement under § 2B1.1(b)(10)(C). A scheme can involve sophisticated means even if "none of the offenses, standing alone, is 'especially complex' or 'especially intricate.'" *United States v. Masters*, 216 F. App'x 524, 525 (6th Cir. 2007). This describes the scheme at issue in this case: even though none

of its component parts was especially intricate standing alone, the scheme as a whole was complex. The scheme involved multiple co-conspirators, including licensed therapists. The co-conspirators recruited actual Medicare beneficiaries to obtain their signatures. The files prepared by the therapists were elaborate and contained fake treatment plans, initial evaluations, and progress notes. All of these were steps taken to conceal the ongoing fraud. Indeed, the scheme avoided detection by Medicare for many years. Taken together, these aspects of the scheme amounted to "especially intricate offense conduct pertaining to the execution or concealment of the offense," and therefore the district court did not err by applying a sophisticated means enhancement. U.S.S.G. § 2B1.1 cmt. 8(B).

Finally, the district committed no error in applying a four-level leadership enhancement. Under the Guidelines, a four-level increase is appropriate if the defendant "was an organizer or leader" of a criminal activity that has five or more members. U.S.S.G. § 3B1.1(a). It is undisputed that the scheme had five or more members. In determining whether a defendant was a leader,

> Factors the court should consider include the exercise of decision making authority, the nature and participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. 4. Evidence in the record supports the presence of several of these factors. Mahmud attempted to recruit accomplices into the scheme by attempting to purchase files from Chand. Further, the Government proved Mahmud had a planning role by virtue of the fact that he told others what dates to use on patient files so that they could avoid having claims rejected because

of overlapping care and the 2006 cap on therapy claims. He also exercised significant control over the scheme since he was the only member that could actually file claims with Medicare. Finally, he took a 25% cut of the payments the scheme received—a fact that indicates he claimed a larger share of the fruits of the crime. Because the "trial judge is most familiar with the facts and is best situated to determine whether someone is or is not a 'leader,'" a deferential review of the trial court's determinations is appropriate. *Washington*, 715 F.3d at 983. Based on the evidence in the record and giving proper deference to the trial court, we cannot say that there was error in applying the leadership-role enhancement.

Mahmud's sentence was moreover substantively reasonable. "A sentence will be found substantively unreasonable when the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any factor." *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008) (internal quotation marks ommitted). Mahmud's argument that his sentence was unreasonable because his co-conspirators received more lenient sentences can be construed as arguing that the judge did not adequately consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" under 18 U.S.C. § 3553(a)(6). But as we have explained, § 3553(a)(6) concerns "*national* disparities between defendants with similar criminal histories convicted of similar criminal conduct," but does not apply to disparities among co-conspirators. *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010) (internal quotation marks omitted). Even if (a)(6) did apply to co-conspirators, there would be no "unwarranted"

disparity in this case because Mahmud proceeded to trial whereas his co-conspirators admitted fault and cooperated with the Government. It should be no surprise that those co-conspirators received more lenient sentences.

Mahmud also argues that his sentence was unreasonable because the trial court did not adequately credit the fact that Mahmud surrendered his Medicare billing number and stopped doing business before he was indicted. Because the district court judge imposed a within-Guidelines sentence, this court may choose to presume the district court's sentence was reasonable. *Gall*, 552 U.S. at 51. The district court's refusal to give more weight to Mahmud's argument in this regard is not enough to rebut that presumption.

Mahmud's conviction and sentence are AFFIRMED.