NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0583n.06

No. 15-1860

**FILED**

Oct 28, 2016

DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| WILFRED GRIFFITH, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:     MOORE, ROGERS, and SENTELLE, Circuit Judges.**\***

SENTELLE, Senior Circuit Judge.  Wilfred Griffith was convicted for his involvement in a Medicare fraud conspiracy and a kickbacks conspiracy and sentenced to a total of 60 months' imprisonment.  On appeal, Griffith challenges the district court's decision to exclude a printed copy of a Michigan statute as a trial exhibit and the district court's Sentencing Guidelines calculation.  Because the district court did not commit reversible error in excluding the statute or in calculating Griffith's sentence, we affirm.

I.

A.

This case involves a scheme to defraud Medicare in which Wilfred Griffith and his co-defendants bribed Medicare beneficiaries, referred those beneficiaries for fake home

---

**\***The Honorable David B. Sentelle, Senior Circuit Judge for the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

healthcare services, and then billed Medicare for those "services." The scheme began with Tausif Rahman, who owned several medical clinics and companies that provided home healthcare services to Medicare beneficiaries. Because Medicare only covers home healthcare services if a licensed physician refers the beneficiary for those services, Rahman partnered with Dr. Dwight Smith, a licensed physician and registered Medicare provider. Dr. Smith's main role was to sign referrals for home healthcare services. Because he only came into the office once a week, Dr. Smith often pre-signed referral and prescription forms, which were later completed by Rahman's employees.

To effectuate the fraudulent scheme, Rahman paid kickbacks to "recruiters" and "marketers" for each Medicare beneficiary they brought into his medical clinics. Once the marketers brought the beneficiaries to the clinics, the beneficiaries provided their Medicare information and signed forms that Rahman's employees filled out later. Using Dr. Smith's signatures, Rahman's employees referred these beneficiaries to Rahman's home healthcare companies, which often billed Medicare for home healthcare services that were either unnecessary or never provided. As Rahman explained at trial, he used the marketers to "help" patients sign the documents and then his companies would "just bill . . . Medicare."

Griffith worked at Rahman's medical clinics. Although he attended medical school in the Caribbean, he was not a licensed physician and did not have a Medicare provider number. His primary duties entailed meeting with Medicare beneficiaries and completing Dr. Smith's pre-signed referral forms. To explain Griffith's role, the Government presented testimony at trial from two Medicare beneficiaries who had been treated by Griffith. One beneficiary testified that Griffith gave him prescriptions for controlled substances and enrolled him in home healthcare services that were either unnecessary or never provided. Notably, the beneficiary could not

recall Griffith's ever being accompanied by a doctor during their contacts. The beneficiary testified that when he noticed that Medicare billed him for services that he did not receive, Griffith told him not to worry because Medicare was covering the expenses automatically. Griffith denied making that statement.

Another beneficiary testified that Griffith prescribed her painkillers and enrolled her in home healthcare services that she did not need or receive. The beneficiary testified that, although she did not request it, Griffith subsequently increased the dosage of her painkillers, explaining that he "just gave them to me." This beneficiary also testified that she received money in exchange for signing blank and undated medical forms.

Despite the fact that he was working for Rahman, Griffith did not refer these two Medicare beneficiaries to Rahman's home healthcare companies. Instead, Griffith referred them to Cherish Home Health Services ("Cherish"), a rival fraud scheme. The owner of Cherish, Zia Hassan, employed a scheme similar to Rahman's to defraud Medicare: Hassan paid Medicare beneficiaries to fill out paperwork and then used their information to bill Medicare for home healthcare services that were never provided. The Government presented evidence showing that approximately 70% of Cherish's Medicare claims were fraudulent.

Similar to his work with Rahman's companies, Griffith was a "marketer" or "community liaison" for Cherish, and was paid between $300 and $400 for each Medicare beneficiary that he forwarded to Cherish rather than to Rahman's companies. To assist Cherish in its scheme, Griffith compiled lists of patients and sent them to Cherish's employees to confirm each patient's Medicare status. Cherish's employees would then send the lists back to Griffith, noting which patients were Medicare beneficiaries who were not already enrolled in home healthcare. Because Cherish could not bill Medicare for home healthcare services unless licensed physicians

were certifying and referring the Medicare beneficiaries, Griffith obtained referrals—each signed by Dr. Smith—for the beneficiaries. Dr. Smith was not aware that Griffith was referring beneficiaries to Cherish using his pre-signed forms. Griffith, on the other hand, testified that he referred patients to Cherish because he learned about Dr. Smith's and Rahman's illegal activities and did not want to be involved in any unlawful practices.

In 2011, Rahman became aware that Griffith was redirecting some of his home healthcare referrals to Cherish, and Griffith soon admitted that he was receiving payments from Hassan for sending patients to Cherish. Rahman decided to match Hassan's offer, giving Griffith $400 for each Medicare beneficiary he referred to Rahman's companies. Conversely, when Dr. Smith found out about Griffith's referrals to Cherish, Dr. Smith refused to work with Griffith. Rahman and Hassan were eventually able to reach an agreement concerning their competing fraud schemes, but the agreement came to an end in September 2011 when Rahman was indicted for Medicare fraud.

Because he could no longer work with Rahman or Dr. Smith, Griffith teamed up with another licensed doctor and Medicare provider, Dr. Ruben Benito. Using Dr. Benito's signatures on home healthcare referrals, Griffith and Cherish continued the scheme.

Federal investigators soon discovered Griffith's involvement in the scheme and interviewed him. During the interview, Griffith confessed to: (1) prescribing home healthcare services and narcotics to Medicare beneficiaries; (2) using Dr. Smith's pre-signed prescription pad; (3) receiving $400 kickbacks from Hassan for referring Medicare beneficiaries to Cherish; (4) signing Dr. Smith's name on referrals to Cherish without Dr. Smith's knowledge; and (5) using Dr. Benito to refer Medicare beneficiaries to Cherish. With Griffith's consent, the agents searched his medical bag and found physical evidence connecting Griffith to the scheme,

including a Cherish referral form listing Griffith's personal cell phone number and fax number. Griffith also identified two specific beneficiaries he had referred to Cherish using Dr. Benito's name. The Federal Bureau of Investigation obtained Cherish's lists of patients, which confirmed that Cherish had billed Medicare for the beneficiaries that Griffith had forwarded. Cherish's billing records revealed that, between November 2009 and December 2013, Medicare paid Cherish over $4.6 million, with $680,922.78 of that amount coming from claims where Dr. Smith or Dr. Benito was listed as the referring doctor.

B.

At trial, Griffith put forward an advice-of-counsel defense, claiming that an attorney had advised him that Michigan law permitted him to practice medicine under the supervision of a licensed physician. To support his defense, Griffith sought to introduce two exhibits: (1) a letter from the attorney purportedly explaining that Michigan law allowed Griffith, who was not a licensed physician, to practice medicine under the supervision of a licensed physician; and (2) a copy of a Michigan statute, M.C.L. § 333.16215(1), that was supposedly cited in the attorney's letter. Griffith eventually withdrew his attempt to admit the letter as an exhibit and instead focused solely on admitting the statute, which provides that a licensed physician may "delegate . . . selected acts, tasks, or functions" to an "unlicensed individual who is otherwise qualified" and who will perform those acts, tasks, or functions "under the [licensed physician's] supervision," unless "the act, task, or function, under standards of acceptable and prevailing practice, requires the level of education, skill, and judgment required of the [licensed physician] . . . ." M.C.L. § 333.16215(1). The defense argued that, because the attorney had cited the statute's "name" and "number" in the letter, Griffith had relied on the statute and the statute was therefore relevant to his intent to defraud Medicare.

The Government objected to the introduction of § 333.16215(1) as a trial exhibit and filed a motion in limine requesting that the Court preclude Griffith from offering a copy of the statute into evidence. The district court granted the Government's motion. *See United States v. Griffith*, No. 2:13-cr-20894, 2015 WL 471426, at \*3–6 (E.D. Mich. Feb. 4, 2015). In addition to finding that the statute was irrelevant, *id.* at \*4–6, the district court held that admitting the statute into evidence would "thrust the jury into a quasi-judicial role and confuse them as to their fact-finding function," *id.* at \*4. The Government, however, did not object to Griffith's testifying that he had obtained advice from an attorney on this issue. The district court therefore permitted Griffith to present his advice-of-counsel defense to the jury. At trial, Griffith testified that he consulted with an attorney in the early 1990s who advised him that "Michigan law" allowed Griffith to "work under a [licensed] physician" and "do anything that a physician can do, except surgery."

The jury convicted Griffith of one count of health care fraud conspiracy, in violation of 18 U.S.C. § 1349; *see also id.* § 1347, and one count of conspiracy to receive health care kickbacks, in violation of 18 U.S.C. § 371.

C.

Prior to sentencing, Griffith filed a "Motion for Downward Departure and/or Downward Variance," requesting a number of adjustments to the Probation Department's Sentencing Guidelines calculation. In Griffith's Presentence Investigation Report, the Probation Department calculated an offense level of 24 and criminal history category II, resulting in a guidelines range of 57 to 71 months. Because Griffith's case involved fraud, the Probation Department calculated his sentence using a base offense level of six, *see* U.S.S.G. § 2B1.1(a)(2), and applied a fourteen-level increase to the base offense level because the loss amount exceeded $400,000, *see*

*id.* § 2B1.1(b)(1)(H) (2014). The Probation Department also applied a two-level increase for use of sophisticated means, *id.* § 2B1.1(b)(10)(C), and a two-level increase for use of a special skill, *id.* § 3B1.3.

Relevant to this appeal, Griffith argued in his motion for downward departure that the loss amount should include only those referrals to Cherish made under Dr. Benito's name, which would result in a twelve-level adjustment to his base offense level rather than the fourteen-level adjustment calculated by the Probation Department. He also argued that, because he was "a minimal participant" in the scheme, he was entitled to a four-level downward adjustment, *see id.* § 3B1.2(a). Finally, he asserted that a two-level enhancement for "sophisticated means" was unwarranted. The Government objected to Griffith's proposed adjustments. The district court denied Griffith's motion and sentenced him to a total of 60 months' imprisonment.

Griffith appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We first consider Griffith's challenge to the district court's decision precluding him from introducing a copy of the Michigan statute, M.C.L. § 333.16215(1), into evidence. Griffith frames his challenge to the district court's evidentiary ruling in constitutional terms, arguing that the decision violated his constitutional right to present a complete defense. In challenging the district court's ruling, Griffith attempts to extract from various Supreme Court cases "a general rule that a criminal defendant must be permitted to present any evidence that []he deems critical to [his] defense." *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc). Griffith's approach is unavailing. Although "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), "the Supreme Court has

made it perfectly clear that the right to present a 'complete' defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions," *Rockwell*, 341 F.3d at 512; *see also United States v. Scheffer*, 523 U.S. 303, 308 (1998) (stating that "[a] defendant's right to present relevant evidence is not unlimited"); *Montana v. Egelhoff*, 518 U.S. 37, 42, 53 (1996) (plurality opinion) (explaining that the Supreme Court has "*not* set[] forth an absolute entitlement to introduce crucial, relevant evidence," and noting that such a rule would be "simply indefensible") (emphasis in original). Because "[t]he Federal Rules of Evidence, including Federal Rule of Evidence 403, are such reasonable restrictions," *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010), a district court may "exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury," *Holmes*, 547 U.S. at 326; *see also Egelhoff*, 518 U.S. at 42–43 (plurality opinion) (describing "familiar and unquestionably constitutional evidentiary rules [that] authorize the exclusion of relevant evidence," including Federal Rule of Evidence 403). Therefore, we review "all evidentiary rulings—including constitutional challenges to evidentiary rulings—under the abuse-of-discretion standard." *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997)); *see also United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005) (holding that "it is an abuse of discretion to make errors of law or clear errors of factual determination").

Further, even if we assume that the district court erroneously excluded the statute, its ruling is subject to harmless error review. *United States v. Dimora*, 750 F.3d 619, 628 (6th Cir. 2014); *see also Couturier v. Vasbinder*, 385 F. App'x 509, 517 n.2 (6th Cir. 2010) (applying harmless error analysis to a claim that exclusion of evidence violated defendant's right to present a complete defense). Thus, the district court's decision is reversible only if the excluded

evidence, "evaluated in the context of the entire record[,] creates a reasonable doubt that did not otherwise exist." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (citation, internal quotation marks, and alteration omitted); *see also Dimora*, 750 F.3d at 628. In view of the considerable array of evidence against Griffith, the district court's exclusion of the statute did not alter the verdict and thus, "any error was harmless." *Dimora*, 750 F.3d at 628.

The Government's evidence established that the entirety of the scheme, as well as Griffith's conduct, was unlawful and fraudulent. The evidence showed that Griffith's role was to meet Medicare beneficiaries and use their information to enable Cherish to fraudulently bill Medicare for non-existent or unnecessary services. Griffith enticed Medicare beneficiaries by providing them with narcotics and then referred the beneficiaries for home healthcare services that were either unnecessary or never provided. The evidence further showed that Griffith accepted kickbacks for each Medicare beneficiary that he referred to Cherish. Griffith does not argue that the Michigan statute in any way justifies or excuses his acceptance of these kickbacks. Griffith also confessed to most of the conduct at issue and agents found physical evidence supporting the charges. Importantly, Griffith was permitted to present his advice-of-counsel theory to the jury during his testimony. *See United States v. Anthony*, 545 F.3d 60, 66–67 (1st Cir. 2008) (noting that a defendant's testimony "as to what he was told" about legal materials "bears less of a risk of confusing the jury on the law, and is in any event more probative of the subjective belief of the defendant" than admitting the materials) (citation and internal quotation marks omitted). Based on this evidence, "[o]ne evidentiary mistake, if a mistake it was, . . . would not have made a difference to the jury." *Dimora*, 750 F.3d at 629 (citing *United States v. Lane*, 474 U.S. 438, 450 (1986)). Accordingly, the district court did not commit reversible error by precluding Griffith from introducing a copy of the Michigan statute as a trial exhibit.

III.

Griffith also raises three challenges to the district court's Sentencing Guidelines calculation. A sentence is procedurally unreasonable if the district court improperly calculated the defendant's Guidelines range. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Stubblefield*, 682 F.3d 502, 510 (6th Cir. 2012); *United States v. Poulsen*, 655 F.3d 492, 512 (6th Cir. 2011). We review challenges to the procedural reasonableness of a defendant's sentence under a "deferential abuse-of-discretion standard." *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013) (citing *Gall*, 552 U.S. at 41, 51; *Stubblefield*, 682 F.3d at 510).

A.

First, Griffith argues that the district court erred in determining the loss amount. We review the district court's determination of the loss amount for clear error. *United States v. Peppel*, 707 F.3d 627, 645 (6th Cir. 2013); *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009). To succeed on appeal, Griffith must "demonstrat[e] that the [district] court's evaluation of the loss was not only inexact but outside the universe of acceptable computations." *Martinez*, 588 F.3d at 326 (citations and internal quotation marks omitted).

At the time of Griffith's sentencing, the Guidelines allowed for a fourteen-level increase to the defendant's base offense level in any fraud case where the amount of loss exceeded $400,000. U.S.S.G. § 2B1.1(b)(1)(H) (2014). Although a district court must determine the loss amount by a preponderance of the evidence, *Peppel*, 707 F.3d at 645, it need only make "a reasonable estimate of the loss based on available information as appropriate and practicable under the circumstances," *United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)) (alteration omitted).

By adding up the payments from Medicare to Cherish where Dr. Smith or Dr. Benito was listed as the referring doctor, the district court determined that the loss amount was $680,922.78. Griffith argues that the district court erred in determining the loss amount because he should have been held liable only for the patients referred under Dr. Benito's name. Relying on the Government's evidence at trial and the Presentence Report, the district court found that the Government satisfied its burden in showing that Griffith was responsible for a loss amount based on the referrals to Cherish under both Dr. Smith's and Dr. Benito's names. Once the Government met its burden, Griffith had the burden of proving "the specific value" by which this amount should have been reduced. *Washington*, 715 F.3d at 984–85; *see also United States v. Meda*, 812 F.3d 502, 520 (6th Cir. 2015). But, as the district court noted, Griffith failed to produce *any* evidence to put the loss amount in dispute. Based on the record, and because Griffith's challenge to the loss amount was nothing more than "a bare denial," *Poulsen*, 655 F.3d at 513 (citation omitted), the district court did not clearly err in making its loss amount determination. *See Meda*, 812 F.3d at 520; *Washington*, 715 F.3d at 985.

## B.

Second, Griffith argues that the district court erred in enhancing his base offense level by two levels for the use of "sophisticated means." The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n. 9(B). Because district courts are permitted to focus on the "the totality of the defendant's conduct" rather than "the individual steps" of the scheme, *United States v. Masters*, 216 F. App'x 524, 526 (6th Cir. 2007), "[a] scheme can involve sophisticated means even if none of the offenses, standing alone, is especially complex or especially intricate," *United States v. Mahmud*, 541 F. App'x 630, 636

(6th Cir. 2013) (citation and internal quotation marks omitted). The district court's sophisticated means determination will be upheld unless it is clearly erroneous. *United States v. Kennedy*, 714 F.3d 951, 961 (6th Cir. 2013); *United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996).

Griffith asserts that there is "nothing . . . particularly sophisticated" about his "purported creation of fabricated referral paperwork." We disagree. Fabricating paperwork to deceive the Government into paying money can support the sophisticated means enhancement. *See United States v. Pierce*, 643 F. App'x 500, 503 (6th Cir. 2016); *see also United States v. Cosgrove*, 637 F.3d 646, 667 (6th Cir. 2011). But the district court did not rest its decision solely on Griffith's creation of fabricated referral paperwork. The district court determined that Griffith used sophisticated means by recruiting Medicare beneficiaries, creating fraudulent referral paperwork, and posing as a licensed physician to prescribe narcotics and home healthcare services to patients. In light of this evidence, the district court's decision was not clearly erroneous. *See Mahmud*, 541 F. App'x at 636 (holding that district court did not err in finding that similar scheme involved sophisticated means).

## C.

Griffith's third and final challenge to the Guidelines calculation concerns the district court's denial of his request for a mitigating role adjustment pursuant to U.S.S.G. § 3B1.2. Section 3B1.2 "authorizes a four-level reduction in offense level if the defendant is deemed a 'minimal' participant in the criminal activity[] [and] a two-level reduction if he is deemed a 'minor' participant . . . ." *United States v. Skinner*, 690 F.3d 772, 783 (6th Cir. 2012). The difference between "minimal" and "minor" is "not just semantic," *United States v. Lopez*, 937 F.2d 716, 728 (2d Cir. 1991), and the standards are not interchangeable. *See* U.S.S.G. § 3B1.2 cmt. n. 5 (defining a "minor participant" as "a defendant . . . who is less culpable than most other

participants in the criminal activity, but *whose role could not be described as minimal*")
(emphasis added); *United States v. Friedman*, 998 F.2d 53, 60 (2d Cir. 1993) (holding that the
district court improperly used the "two different standards [under U.S.S.G. § 3B1.2]
interchangeably," thus "blurring the distinction between Section 3B1.2(a) and (b)").

Both Griffith and the Government focus their arguments on appeal on § 3B1.2(b)'s
two-level adjustment for a "minor participant," but before the district court, Griffith requested a
four-level adjustment under U.S.S.G. § 3B1.2(a) as a "minimal participant." Because Griffith
failed to raise the § 3B1.2(b) "minor participant" objection in the district court, he forfeited the
issue on appeal and we review for plain error. *United States v. Mabee*, 765 F.3d 666, 671 (6th
Cir. 2014); *see also United States v. Ashby*, No. 96-3501, 103 F.3d 131, 1996 WL 724275, at *1
(6th Cir. Dec. 16, 1996) (denying defendant's "alternative[]" argument on appeal that he was
entitled to the "minimal participant" reduction because he failed to raise the argument in the
district court); *United States v. Foster*, 988 F.2d 206, 209–10 (D.C. Cir. 1993) (explaining that
U.S.S.G. § 3B1.2 challenges may be forfeited if the defendant "fails to bring these challenges to
the attention of the sentencing court").

The "minor participant" adjustment applies only if the defendant is "less culpable than
most other participants and substantially less culpable than the average participant." *United
States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010) (citations and internal quotation marks
omitted). "[A] defendant whose role has 'importance in the overall scheme' . . . is not a minor
participant," *United States v. Salas*, 455 F.3d 637, 643 (6th Cir. 2006) (quoting *United States v.
Salgado*, 250 F.3d 438, 458 (6th Cir. 2001)), even if "someone else planned the scheme and
made all the arrangements," *Skinner*, 690 F.3d at 783 (citation and internal quotation marks
omitted). Thus, to be entitled to the minor participant adjustment, the defendant must prove by a

preponderance of the evidence that he played "a relatively minor role" in the scheme. *Id.* (citation and internal quotation marks omitted).

Griffith argues that, unlike the owners and doctors, his role was "hardly indispensable" to the success of the scheme because he was nothing more than a "marginal middleman." The district court found that Griffith "played a large role" in the conspiracy by "funneling Medicare beneficiaries to Cherish, for kickbacks, so that Medicare could be billed for unnecessary or unperformed services." The district court further noted that Medicare paid over $680,000 that it would not have paid but for Griffith's involvement. Based on the record, even if his involvement could be described as "limited," Griffith played an "indispensable role," *Salas*, 455 F.3d at 644, because "his actions enabled the very purpose of the scam," *United States v. Elias*, 107 F. App'x 634, 639 (6th Cir. 2004). Moreover, we have repeatedly held that "[s]imply because the court *could* have applied a minor role adjustment under the facts of th[e] case[,] does not mean that the district court was *required* to apply the adjustment." *Salas*, 455 F.3d at 643–44 (emphasis in original) (citations and internal quotation marks omitted). Accordingly, the district court did not commit reversible error in denying Griffith's request for a mitigating role adjustment.

IV.

In short, the district court committed no reversible error. The judgment of the district court is affirmed.